W. H. STUTSMAN, Respondent, v. J. H. COOK, et al. THE NORTHERN TRUST COMPANY, a Corporation, Appellant.

(204 N. W. 976.)

**Warehousemen — warehouseman, selling grain and applying proceeds to own benefit, guilty of conversion.**

1. A warehouseman who ships all of the grain stored in his warehouse out of the state, sells the same, and applies the proceeds thereof on his own indebtedness and has no grain in his warehouse, nor in terminal elevators, for the redemption of outstanding storehouse tickets, converts the grain so stored, he and his bondsmen are liable for the value of such converted grain.

---

Note.— (1) Conversion of grain by warehouseman, see 27 R. C. L. 1000.

(3) Liability on warehouseman's bond, see anno. L.R.A.1918E, 235.

**Warehousemen — demand unnecessary when unavailing.**

2. When a warehouseman is insolvent and has no grain to redeem storage tickets, and where it appears from the evidence that a demand would have been unavailing, a demand is not necessary.

**Warehousemen — object of warehouse law, requiring bond and rights of ticket holders stated.**

3. The warehouse law is for the benefit of the grain farmer. Its object and purpose is to provide for the storing of the farmers grain to give him an opportunity to hold his grain for the best market and to secure to him the delivery of his grain in like and quantity. The law requires the warehouseman to furnish a bond sufficient in amount to protect outstanding ticket holders. The ticket holder may keep his grain stored indefinitely; when the market is satisfactory to him he is entitled to the delivery of the grain and if the grain is converted, it follows that he is entitled to the value of the grain at the time he made his demand therefor.

**Warehousemen — liability on bond stated.**

4. The defendant, the Northern Trust Company, furnished to the defendant Cook the bond required by law and which provides:—"Liability upon this undertaking commences on the 1st day of August, 1919, and terminates on the 31st day of July, 1921." Under such bond the Northern Trust Company is not liable for the conversion of grain or the unlawful acts of the warehouseman prior to its execution, but if the warehouseman had outstanding storage tickets for grain, which grain was converted by him after the execution of the bond and before liability ceases thereon, the bond is liable therefor under § 3111, Comp. Laws, 1913, which provides that the bond shall be in sufficient amount to protect the holders of outstanding storage tickets.

**Warehousemen — burden on bondsman to prove replenishment of grain.**

5. When an insolvent warehouseman ships and sells all of the grain stored in his warehouse, leaving none for the redemption of warehouse tickets, and the surety company, liable on bond for the grain so sold and converted, claims that the common mass of grain in the elevator was replenished and restored in sufficient quantity and in like kind and grade for the redemption of all outstanding warehouse tickets, and that on account thereof the former conversion was waived and the subsequent bond was solely liable, the burden is on such surety company to prove the replenishment, in whole or in part, and in the absence of such proof the court can not fix the liability of the sureties on the subsequent bond.

**Warehousemen — there is no right of contribution between sureties on bonds for different periods.**

6. The warehouseman's bond required by law is in each case for a period of two years and the surety company furnishing the bond is liable thereon for all conversions of the warehouseman during that two-year period only, and

there is no right of contribution between sureties on bonds for different periods.

**Principal and surety — subrogation — sureties held to account; prior bond held entitled to subrogation to rights of warehouseman for balance.**

7. The warehouseman in this action turned over to the sureties on the personal bond, notes, life insurance and bills receivable, the proceeds of which were to redeem outstanding warehouse receipts issued during the life of the personal bond. · Such sureties should be held to a strict accounting to the trial court, and required to deposit in court all property and money left after the redemption of storage tickets for which said bond is liable, and the prior bond of the Northern Trust Company be subrogated to the rights of defendant Cook for any balance remaining after the redemption of outstanding storage tickets.

Opinion filed May 28, 1925. Rehearing denied August 12, 1925.

Principal and Surety, 32 Cyc. p. 244 n. 5. Subrogation, 37 Cyc. p. 435 n. 67 New. Warehousemen, 40 Cyc. p. 407 n. 75 New, 78, 79 New; p. 440 n. 30, 36; p. 474 n. 15 New; p. 481 n. 41.

Appeal from the District Court of Pierce County, *Burr*, J.

Modified and affirmed.

*Pierce, Tenneson, Cupler & Slambaugh,* and *W. H. Adams,* for appellants.

Where a bond is given under the authority of a statute in force when it is executed, in the absence of anything appearing to show a different intention, it will be presumed that the intention of the parties was to execute such a bond as the law required, and such statute constitutes a part of the bond as if incorporated in it, and the bond must be construed in connection with the statute and the construction given to the statute by the courts. Such a bond must be given the effect which in reason must have been intended by the statute. Whatever is included in the bond, and is not required by the law, must be read out of it, and whatever is not expressed, and ought to have been incorporated, must be read as if inserted into it. 9 C. J. pages 34, 35; Equitable Surety Co. v. Board of Finance (Ind.) 117 N. E. 860; U. S. F. & G. Co. v. Poetker (Ind.) L.R.A.1917B, 984, 102 N. E. 373; State v. Heim (Ind.) 108 N. E. 776; Henry County v. Salmon (Mo.) 100 S. W. 20; Yoargain v. Board of Commissioners (Okla.) 215 Pac. 619.

The liability of a surety on a statutory bond cannot be enlarged by implication beyond its terms and its statutory office. 9 C. J. p. 40, note 49. Albers Commission v. Spencer (Mo.) 139 S. W. 321, Ann. Cas. 1912D, 705; Hill v. Keller (Mo.) 139 S. W. 523.

When the warehouseman ships grain out and substitutes for it other grain which he has purchased, the grain he places in the common mass passes to the holders of the receipts to the extent required for redemption. Kastner v. Andrews, 194 N. W. 824.

The right to claim that an act constitutes conversion "may be waived by acts indicating a continued claim of ownership, by ratification of the tortious act, by taking back the property as if no tort had been committed." 38 Cyc. p. 2042, notes 40 to 43.

And the waiver of a conversion by receipt of the property carries with it a waiver of the damages resulting therefrom. Collins v. Lowery, 78 Wis. 329, 47 N. W. 612.

It is the date of the conversion that determines the liability of sureties for successive terms. Ingram v. McCombs, 17 Mo. 558; State use of Pace v. McCormack, 50 Mo. 568, 13 Mo. 7; Governor v. Robbins, 7 Ala. 484; Dumas v. Patterson, 9 Ala. 484.

Persons are cosureties, so to give the right of contribution, when they are bound for the performance by the same principal of the same duty; and whether they become so at the same time or at different times, by one or by several instruments, and even that they are bound in different amounts, or that each is ignorant that the others are sureties, does not affect the relation nor the right. Young v. Shunk, 16 N. W. 402; Stone-Ordean Wells Co. v. Taylor (Minn.) L.R.A.1918E, 94, 166 N. W. 1069.

*W. H. Stutsman,* for respondent.

When a liability has once arisen it continues till barred by limitations, that a new liability may come along and join it does not terminate the old, and it is not at all inconsistent that several undertakings can be simultaneously liable for the same default.

It was not necessary to exhaust the remedies against the obligor in the first bond before bringing suit on the second. State v. Mitchell, 132 Ind. 461, 32 N. E. 86, following Allen v. State, 61 Ind. 288.

BURKE, J. This is an action upon two warehouse bonds: One

given by the defendant, the Northern Trust Company, on the 1st day of August, 1919; the other given on the 1st day of August, 1921, by the defendants Hans Rothgarn, Martin Champion, E. F. Charlebois, E. J. Allen, and J. S. Odland. The Northern Trust Company had furnished bond for the said J. H. Cook for the two years preceding August 1st, 1919, and it was agreed at the trial that if there was any liability on said previous bond that the same might be litigated in this action. There is no question about the legality of the bonds. They were executed and approved as provided by law, and under said bonds the defendant, J. H. Cook, received his license as a public warehouseman. A jury was waived and the action was tried to the court who made his findings of fact and conclusions of law upon which judgment was duly entered.

According to the findings of fact and in accordance with the evidence it appears that the defendant J. H. Cook, prior to October 30th, 1915, was engaged in operating a public elevator and warehouse in Willow City, Bottineau county, North Dakota; that on the 1st day of August, 1919, the defendant, the Northern Trust Company, executed and filed with the state inspector of grades, weights and measures of said state a surety bond in the sum of $5,000 conditioned to secure the faithful performance by the said J. H. Cook of his duties as such public warehouseman and his compliance with the laws of the state of North Dakota and the rules and regulations adopted by the State Inspector of grades, weights and measures for the payment of all grain purchased and of all sums for which he should become liable to the holders of warehouse receipts; liability upon said undertaking to commence on the 1st day of August, 1919, and to terminate on the 31st day of July, 1921. On said last mentioned date the other defendants executed and filed with the Board of Railroad Commissioners a surety bond in the sum of $5,000 containing the same conditions and conforming to the laws of the state of North Dakota in all respects.

The court also found as a fact that prior to July 31st, 1921, the said J. H. Cook was insolvent and if the storage tickets involved in this action had been presented to him on or after that date he would have been unable to redeem them as provided by law; that on the 27th day of May, 1919, one R. W. Lazier presented to the defendant J. H. Cook storage ticket No. 1117 and demanded a return of the wheat repre-

sented by said ticket, and that said J. H. Cook was unable to redeem said ticket either by return of wheat of a like kind and quantity or by payment in money for the same; that on the 8th day of April, 1922, the defendant Cook ceased to redeem storage tickets but continued operating the elevator until September, 1922, when the bond was cancelled and the elevator closed; that prior to the commencement of this action all of the ticket holders assigned their tickets and their right of action founded thereon to this plaintiff who now owns the same and is prosecuting this action in his name for their use and benefit. It also appears in the findings that all of the storage tickets issued under the last bond were taken up and paid for by the sureties on the bond and that all the tickets sued on in this action were issued during the two years that the Northern Trust Company bond was in force, except the Lazier ticket which was issued prior thereto and demand made on the 27th day of May, 1919. It further appears as a fact that all of the wheat represented by the storage tickets involved in this action had been shipped out and sold by the warehouseman to John Miller & Company of Duluth, Minnesota, and to the Hoover Grain Company of Minneapolis, Minnesota, by the end of July, 1921, that being the close of the wheat season, and that the defendant J. H. Cook received no money therefor but was given credit on account, and that a demand upon the warehouseman would have been unavailing on account of his insolvency and inability to pay or return the wheat.

Upon the findings of fact the court found as conclusions of law that all of the storage ticket holders were entitled to recover from J. H. Cook the value of their grain stored in said elevator, and that as between the Northern Trust Company and the defendants Rothgarn, Champion, Charlebois Allen and Odland, sureties on the last mentioned bond, the Northern Trust Company was primarily liable and the sureties on the other bond were secondarily liable, and that the plaintiffs must exhaust their remedy against the Northern Trust Company by execution, and that on failure to recover from the Northern Trust Company on execution, execution might issue against the other defendants. Judgment was duly entered on the findings and conclusions and the defendant trust company appeals to this court.

The defendant contends that the court erred:

First:—In holding that the Northern Trust Company is liable to

R. W. Lazier for the amount due from the defendant Cook to said Lazier on storage ticket issued to Lazier, and in holding that the bond executed by the Northern Trust Company and sued upon in this action is in any manner liable upon or by reason of said storage ticket. This storage ticket was issued October 30th, 1915, but no demand was made until May 27th, 1919, and there is no proof that Cook could not have delivered a like quantity of grain before the time of demand and therefore no proof of conversion prior to May 27th, 1919.

Second,—In holding and deciding that all of the ticket holders were entitled to recover from defendant, the Northern Trust Company, the market value of the grain described in the storage tickets issued to them, as set out in the findings on April 15th, 1922, with interest, less storage charged; and in deciding that the bond executed by the Northern Trust Company is liable to the holders of said storage tickets as due the plaintiff in any amount.

Third,—In not deciding that the liability of the defendant Cook upon the storage ticket sued upon is a result of a breach of duty of said warehouseman Cook during the term of the personal bond executed by the defendants other than the Northern Trust Company which was in force from August 1st, 1921, to July 31st, 1923, and that no breach of duty on the part of said warehouseman, or damages to the holders of said tickets or to the plaintiff as a result of any breach of duty, occurred during the term of the bond executed by the Northern Trust Company which was in force from August 1st, 1919 to July 31st, 1921.

Fourth,—In deciding that the bond of the Northern Trust Company is primarily liable to the holders of said storage tickets and to the plaintiff, and that the bond executed by the remaining defendants is secondarily liable therefor, and in not deciding that if both bonds are liable to the holders of said storage tickets and to the plaintiff in any amount, such liability is primarily upon the bond executed by the defendants other than the Northern Trust Company.

Fifth,—In not holding and deciding that the remaining defendants are liable as trustee to the Northern Trust Company for the property and securities entrusted to them by the defendant Cook for the redemption of outstanding storage tickets.

Sixth,—The defendant contends that the court erred in its fifth conclusion of law wherein the court sets forth a table of figures for the

computation of the amount due the holders of storage tickets described in the findings in said table and the method of computation is erroneous and there is a total failure of proof of the value of said grain or of any damage sustained by the said plaintiff or the holders of said tickets at any time during the term of the bond executed by the Northern Trust Company, and further assigns as error that the evidence is insufficient to sustain the fourth finding of fact as made by the court.

In reference to the first specification the appellant claims that the storage ticket, No. 1117, issued to R. W. Lazier was settled and arrangements made for the paying of the same. The evidence shows that Lazier presented the ticket and made his demand on the 27th of May, 1919, and again on September 21, 1919, he says: "I said I wished the money to take care of what I owed. He said he did not have the money but would pay a little. I delivered the ticket to him and he kept it half a day and returned it to me. I have held it ever since. Fifty dollars was paid upon it and also I have credited the defendant Cook with some coal purchased from him." These were partial payments on the storage ticket which were deducted by the trial court. The ticket was turned back to Lazier after holding the same for a half day, and it has been in Lazier's possession ever since and is the only evidence of indebtedness that Lazier has for the wheat stored by him. The bond is conditioned that the warehouseman shall pay for all grain purchased and all sums for which said principal shall become liable to the holders of warehouse receipts. It says nothing about settlement but it undertakes to see that the storage receipts are paid and not settled, so there is no merit in appellant's claim. Defendant also claims that it is not liable on the Lazier ticket for the reason that demand was made before the bond was executed and delivered and relies upon the case of State ex rel. Reilly v. Farmers' Co-op. Elevator Co. 39 N. D. 235, L.R.A. 1918E, 233, 167 N. W. 223. The facts in the Reilly Case are entirely different. The court says, on page 239:—"During all of the time from 1909 to 1915, plaintiff was a stockholder in said Elevator Company and attended meetings of stockholders at which the financial condition of the company was discussed. Shortly after August 1, 1911 (the date the bond of the Northern Trust Company by its terms expired) an agent of the Elevator Company weighed the grain then in the elevator, and the grain called for by plaintiff's storage ticket was actually

on hand and remained there for some time afterwards. Reilly knew the grain was there, and was requested on several occasions by the officers of the company to present his ticket and take the grain, or its value." He knew all about the financial condition of the warehouse. He knew that he could get either the grain or its value, and his failure to get either was his own fault. The record shows that there was no grain in the warehouse at Willow City on July 31st, 1921; that it was shipped out and sold and that the warehouseman was given credit on what he owed John Miller & Company of Duluth, Minnesota. The Reilly Case is also against the contention of the appellant that it is not liable on account of the demand and refusal to deliver having been made before the execution of the bond. Upon this subject the court says: "Surely when the renewal bond was written to become effective August 1, 1911, the amount of storage tickets outstanding would, or at least should, have been considered as obligations of the elevator company which the renewal bond would be liable for in case of a breach of duty by the company during that two-year period. In fact the statute specifically provides that each bond shall be sufficient in amount to protect the holders of outstanding tickets and the same would apply to the second renewal bond running from August, 1913, to August, 1915. And it would appear that one of the reasons why the Commissioners of Railroads were clothed with the wide discretion in the matter of fixing the amount of these bonds was for the purpose of taking into consideration not only the probable amount of business the particular elevator would do, but also the amount of storage tickets outstanding at the time each new bond was given and went into effect. The difference between this case and the case at bar is that the wrongdoing of the Farmers' Co-operative Elevator Company was after the expiration of the bond, while in the case at bar the wrongdoing was during the life of the bond of the Northern Trust Company under which the warehouse operated in 1917 and 1919. This court has therefore decided that the bond covers warehouse receipts that were outstanding at the time of its execution as well as tickets issued after its execution.

It appears in the memorandum opinion of the trial court that, "For the two-year period beginning August 1st, 1917, to August 1st, 1919, the Northern Trust Company, one of the defendants, furnished the

bond, and upon the termination of the period for which this bond was given the same company furnished a bond for a period beginning August 1st, 1919, and ending August 1st, 1921. Suit is brought on the latter bond but the company waives any omission in the pleadings regarding the former bond and consents to have its liability on the former bond determined rather than to have the plaintiff and those whom he represents put to the trouble and expense of another suit. In other words the company is submitting to the court the question of its liability in any event and thus trying this law suit on the merits of the controversy." From this it appears that the warehouseman was operating under a bond furnished by the defendant trust company on the 27th day of May, 1919, when Lazier made his demand and as there was no delivery or payment there was a conversion and the defendant trust company is liable on the bond for the amount of the Lazier storage tickets. Appellant claims that there was no such stipulation while respondent insists that there was. No such stipulation appears in the record, but on page 29 of the transcript, the defendant, Cook, testifies as follows:

Q. What bonding company issued you a bond prior to 1919?
A. The Northern Trust Company.
Q. And on August 1st, 1921, the Northern Trust Company issued a new bond to you?
A. 1919.
Q. Yes, August 1st, 1919 to August 1st, 1921?
A. Yes, they issued the bond.

This testimony was not objected to; it is not contradicted in the record and it is sufficient evidence upon which to base the judge's finding on the subject. It is, however, of very little importance, for under the decisions of this court, in the case of State ex rel. Reilly v. Farmers' Co-op. Elevator Co. supra; in the case of Kastner v. Andrews Grain Co. 49 N. D. 1059, 194 N. W. 824; and in the case of Carson State Bank v. Grant Grain Co. 50 N. D. 558, 197 N. W. 146, the warehouseman and his bond are liable for outstanding storage tickets at the time of the issuing of the bond, when the grain has been replenished by the storing of other grains of like kind and quantity

and the evidence shows that during the grain season of 1919 and 1920, the grain had been replenished in the elevator, and was subject to the storage ticket held by R. W. Lazier.

Appellant's specification of the insufficiency of the evidence to sustain the findings of fact, and that the evidence shows that there was no conversion until the 8th day of April, 1922, affects all the other assignments of error. The contention is that the evidence in the case does not warrant the findings of the trial court that there was a conversion of the grain represented by the storage tickets involved prior to July 31st, 1921, and claims that the undisputed testimony shows that the defendant, Cook, continued to operate his elevator as usual up until September, 1922, and that there was no conversion until April, 1922, when demand was made by some of the ticket holders, and September, 1922, when demand was made by all of the ticket holders, and that during the grain season of 1921, to September, 1922, he purchased more grain than was necessary to redeem all of the outstanding tickets, in proof of which he calls attention to the testimony of the defendant Cook, beginning on page 70 of the transcript, in which Mr. Cook says:—"I operated the elevator from August 1st, 1921, up to about September 8th, 1922. I bought and sold grain in the regular course until they cancelled the bond." Defendant's counsel then asked him this question:—"Now listen to my question, what was the amount of grain approximately that you bought and sold through the elevator during the grain season of 1921 to 1922? Ans.: From the first of September, the new crop you mean? Somewhere from twenty to thirty thousand bushels." "Q: That consists—that is, all told? Not wheat alone? A: Oats, rye and everything. Q: About what was the bushels of durum? A: Most of it was durum. Q: No. 1 Durum? A: There was not any No. 1 amber that was shipped out. Q: Also wheat of different grades? A: One to four, yes. Q: About what was the number of bushels of wheat? A: If I am not mistaken about two cars, I think. Q: That is about the amount of grain you bought and paid for and shipped to John Miller & Company and to the Hoover Grain Company out of the 1921 and 1922 crop? A: Yes, close to that, approximately. It was a very light crop, I know that." So that when this testimony is analyzed it shows that the defendant Cook shipped, during that grain season, two carloads of wheat.

The defendant Cook was an unwilling witness but he states on cross-. examination that all of the grain involved in the storage tickets was received before the end of June, 1921. "I shipped it out at the close of the season. The 1st of August we generally figure as the close of the season. This grain represented by the tickets was cleaned up about the 1st of July. I have my cut-out in July. It was all shipped out to John Miller & Company and to the Hoover Grain Company, either to Minneapolis or to Duluth. It was turned over to the commission houses. They did not give me any money. They gave me credit. I owed both commission houses. I got no cash out of the closing out of the grain."

Q. Supposing the tickets had been presented to you in the month of July, 1921, could you and would you have paid them then?

A. Yes sir, I would.

Q. As a matter of fact at that time you refused, and long prior you had refused, to pay the ticket of Lazier?

A. Yes. I had some money at that time. The Lazier, was not presented then.

Q. How much money or credit did you have that could have been applied to these tickets in July, 1921?

A. I could not say without looking at the tickets. I did not have any money of my own.

Q. The proceeds of the grain was not put to your credit or account so that it belonged to you, but it was applied by you in payment of money advanced by the commission houses? A. Yes sir.

Q. So that after this grain was shipped out you had no money of your own out of the proceeds of that grain? A. No.

Q. Unless the commission houses extended you credit, or other persons had, it would have been impossible to pay the storage tickets during the month of July, 1921?

A. I could not have paid it.

Q. You did not have any grain in your elevator?

A. No. The grain had all been cleaned out of the house at Willow City and that was the only warehouse I had. I had no grain to my credit below. My financial condition during the month of July and

particularly up to and including July 31st, 1921, was pretty close to what it was April 8th or 15th, 1922.

My financial condition in the spring of 1922, in April, was about the same as in July, 1921, so far as actual cash is concerned and so far as property and liabilities. I had just about the same amount. Did not vary much between July 1st, 1921 and April 5th, 1922.

Q. In the month of April, 1922, you were in the same condition as in July, 1921?

A. If you want to force that—certainly.

Q. What I mean is that your tangible assets would not have been sufficient to pay what you owed at either time?

A. I don't think they would, no.

Q. And the grain represented by these storage tickets included in exhibits 1 to 4 inclusive and exhibits 6 and 7 had all been shipped out of your elevator before July 1st, 1921, and was not in your possession or under your control?

A. It was all gone. My house was empty.

Q. If these men, either T. Lehman, E. Lehman, Art Getzluff, Charles Getzluff, Oluf Slatte, or R. W. Lazier had presented storage tickets, or any of them, represented by exhibits 1 to 4 inclusive and 6 and 7, at any time during the month of July, 1921, it would have been impossible for you to pay them?

A. No, I could not. I did not have anything at that time of my own. No property, no.

Q. In the fall of 1921 and spring of 1922, you did not draw more than for the grain shipped?

A. No sir. I did not draw more money than would cover the actual amount of grain shipped. I could not have taken up the storage tickets with that money. I do not know how much I owed then.

Q. $10,000? A. Yes.

Q. How much did you owe them in April? A. About the same.

Q. Do you still owe them? A. Yes.

Q. So that in July, 1921, when the stored grain had reached some 4,000 bushels of wheat, had these storage tickets been presented to you, unless the commission house increased the credits which had already been extended to you, some $4,000 or $5,000, you could not have paid?

A. No.

Q. You never tried them? A. No.

Q. The credit extended to you after that fall was merely covering actual shipments that fall and only on bill of lading?

A. Yes.

Q. And was not paid until the bill of lading was presented?

A. Until it was presented at the bank.

The storage tickets in controversy represent 2903 bushels of No. 1 durum wheat, 61 bushels of No. 4 wheat, and 108 bushels and 30 pounds of No. 2, wheat, and the evidence shows that there was about two carloads of No. 1 durum wheat shipped through the warehouse during the grain season of 1921 and up to the end of said season in 1922. There is no evidence to show how many bushels of wheat there was in a carload and this court can not say and there is no way that this court can determine the liability of the sureties on the bond filed August 1st, 1921. Again, there is no evidence of the number of storage tickets issued during the life of said bond, the sureties thereon having assumed the responsibility of redeeming and paying for all of such storage tickets. The law does not make any distinction between storage tickets.

In the case of Kastner v. Andrews Grain Co. 49 N. D. 1059, 194 N. W. 824, this court said:

"We regard these propositions as established: The holders of warehouse receipts are owners in common of the grain in the warehouse up to the quantity required to redeem the receipts. There is nothing in our statutes which can reasonably be construed as a recognition of an actual authority in the warehouseman to sell stored grain required for the redemption of outstanding receipts. This court has never construed our statutes as conveying any such authority, and the decisions relied upon by the appellant merely recognize the legal fiction of separation and substitution in the case of fungible goods. They involve no question concerning a limitation upon the bailee's right to sell from the common mass. When the warehouseman ships grain out and substitutes for it other grain which he has purchased, the grain he places in the common mass passes to the holders of the receipts, to the extent required for redemption. The holders of the receipts then, must remain

the owners until their title is lawfully divested. The right of the warehouseman to sell as his own being necessarily limited to the quantity over that which is required to redeem outstanding receipts, it follows that, where stored grain is shipped out and sold to the point where the warehouseman cannot redeem the outstanding receipts, property is sold which the vendor does not own."

Again, in the case of Carson State Bank v. Grant Grain Co. 50 N. D. 558, 197 N. W. 146, this court, following the case of Kastner v. Andrews Grain Co. supra, says:—

"Thus it is plain that the holders of warehouse receipts are owners in common of the grain in the warehouse up to the quantity required to redeem such receipts, and the warehouseman may ship out and sell any quantity from the common mass in excess of that required to redeem outstanding receipts; but, if he ships and sells any of the mass above such excess, he and the buyer thereof are guilty of conversion to that extent. It is plain that the ticket holder has no claim or right to the identical grain stored by him. It is likewise plain that the warehouseman may commingle grain purchased and owned by him with that held in storage. He may substitute that which he buys of a like kind and quantity, and, while he has no right to first sell and then substitute, yet, under his contract with his bailor, where he does sell before he substitutes, the law substitutes that which he thereafter buys. The interest of each ticket holder attaches proportionately to the extent that is required to redeem all outstanding storage tickets to all the grain of kind and quality described in his receipt that may at any time subsequent to its issuance be received on account of purchase or general storage into the warehouse, and this even though at some intervening moment there may be no grain whatsoever therein. Thus it necessarily follows that, whenever, subsequent to the issuance of a storage ticket to a bailor of grain, the warehouseman sells from the mass in which such bailor has an interest in common such an amount as to reduce the mass to less than that required to redeem the storage tickets outstanding at the time of such sale, there is a conversion. And there may be as many conversions as there are sales of grain that deplete the common mass, original or replenished, below the quantity required to redeem storage tickets then outstanding."

Section 3114, Comp. Laws 1913, makes the storage of grain a bail-

ment and not a sale and provides that such stored grain "shall at all times, in the event of the failure or insolvency of such bailee, be first applied exclusively to the redemption of outstanding warehouse receipts for grain so stored with such bailee, and, in such event, grain on hand in any particular elevator or warehouse shall first be applied to the redemption and satisfaction of receipts issued by such warehouse."

It is the contention of the appellant, the Northern Trust Company, that the mass of stored wheat in the warehouse was replenished until there was more than enough to redeem all outstanding storage tickets and that therefore there is no liability on the part of appellant. The testimony, however, shows that there was but two carloads of wheat shipped, and under the law the storage tickets issued during that time were entitled to protection in the same proportion as the tickets issued prior thereto, and since there is no evidence showing the number and amount of storage tickets issued after August 1st, 1921, and no evidence of the number of bushels of grain shipped through the warehouse during that period, and no evidence of the amount of wheat stored in said warehouse at any time during the year of 1921 and 1922 it is impossible for this court to fix the liability of the sureties on the individual bond for conversion of grain during its life. The evidence does not show that there was any wheat of like quantity and kind stored in the warehouse after August 1st, 1921, except the inference that arises from the statement that the storage tickets issued after August 1st, 1921, were redeemed by the sureties on the individual bond. The defendant Cook's testimony is, "I bought and sold grain in the regular course until the bond was cancelled about September 8th, 1922." His testimony shows that he was insolvent on the 1st of August, 1921, and continued insolvent right up until the bond was cancelled and the elevator closed. The burden was on the defendant, the Northern Trust Company, to show that the mass of the grain stored in the elevator was replenished, in whole or in part, and since it has failed in its proof this court can not say that there was any stored grain in the elevator of like kind and character during the grain season beginning August 1st, 1921, and ending August 1st, 1922.

Section 3108, Comp. Laws 1913, requires a biennial state license obtained through the railroad commissioners, to expire on the 1st day of August, of each odd numbered year, and § 3111, Comp. Laws 1913,

requires the warehouseman, who does not pay cash in advance for grain, to file with the commission a bond to the state with good and sufficient sureties, to be approved by such commission, for the faithful performance of duty as a public warehouseman and the compliance with all the laws of this state in relation thereto . . . "and shall be in *sufficient amount to protect the holders of outstanding tickets."* Under the authority given to them by law the railroad commissioners require the bond to run for two years and under such authority there is inserted in the bond of the appellant the following,—"Liability upon this undertaking commences on the first day of August, 1919, and terminates on the 31st day of July, 1921, unless sooner cancelled by order of the state inspector of grades, weights and measures." The liability of the Northern Trust Company under this bond commenced on August 1st, 1919, and expired on the 31st day of July, 1921. It is not liable for the conversion of grain or the unlawful acts of the warehouseman prior to its execution but if, before its execution, the warehouseman had outstanding storage tickets, and if, after the execution of the bond, there was a conversion of the stored grain represented by such tickets, or if through an unlawful act of the warehouseman after the execution of the bond through which the ticket holders lost their property, then, in such case, the bond is liable under the latter part of § 3111, Comp. Laws 1913, namely: *"The bond shall be in sufficient amount to protect the holders of outstanding tickets."*

The appellant contends that since the bond contains the provision, "liability upon this undertaking commences on the 1st day of August, 1919, and terminates on the 31st day of July, 1921, unless sooner cancelled by order of the state inspector of grades, weights and measures" that the liability of the company is therein fixed and that it is not liable for anything that happens after the 31st day of July, 1921, and that since no demand was made upon the warehouseman during that period that there was no conversion and therefore the defendant is not liable at all. The trial court found, however, that the defendant Cook was insolvent prior to the 31st day of July, 1921; that he had shipped all of the grain out of the elevator and sold it; that he had no grain, either in his warehouse or in the terminal elevators, and that a demand upon him would have been entirely unavailing; that there was a conversion prior to the 31st day of July, 1921, of all of the grain repre-

sented by the storage tickets involved in this action and that therefore the Northern Trust Company was liable on the bond.

It is the contention of the defendant that the trial court erred in holding that the holders of the tickets were entitled to the value of the grain at the time of the demand. The evidence shows that the holders of all the tickets, except the Lazier ticket, did not know of the insolvency of the warehouseman until demand was made, about April 15th, 1922, and upon that question we find in the record, commencing upon page 77:—

"Mr. Cupler: We are stipulating that so far as the Getzluffs are concerned the demand was made by them on Mr. Cook on April 8th, 1922.

"Mr. Stutsman: (Turning to the Getzluffs) Is that correct?

"Henry Getzluff: Mine was made on the 15th.

"Mr. Cupler: The Art Getzluff tickets were presented on the 8th of April, 1923, can we agree on that?

"Mr. Stutsman: Yes.

"Mr. Cupler: And the Charles Getzluff tickets were presented on April 15th?

"Mr. Stutsman: Yes.

"Mr. Cupler: And the Henry Getzluff tickets were presented on April 15th?

"Mr. Stutsman: Yes.

"Mr. Cupler: As to the price of grain on that day, we have not got the bulletin or card for that day here. Can this not be filed afterwards?

"Mr. Stutsman: Excepting that we contend that we are entitled to the price actually paid by Mr. Cook on that day.

"Mr. Cupler: All right, subject to that objection. (Meaning of course the objection of Mr. Stutsman.)

"Mr. Stutsman: What was it on the 22nd? Is there any evidence about the value on the 22nd.

"The Court: None.

"Mr. Cook: On the 17th No. 1 Durum was $1.

"Mr. Stutsman: Is that alright to get the cards for the 15th and the 22d?

"Mr. Cupler: I don't know the date of that demand. I don't know

of any demand on the 22d. That will be alright. We will furnish the card on the 22d."

The cards were procured and filed under the stipulation.

The warehouse law is for the benefit of the grain farmer. Its object and purpose is to provide for the storing of the farmers' grain to give him an opportunity to hold his grain for the best market and to secure to him the delivery of his grain in like and quantity. The law requires the warehouseman to furnish a bond sufficient in amount to protect outstanding ticket holders. The ticket holder may keep his grain stored indefinitely; when the market is satisfactory to him he is entitled to the delivery of the grain and if the grain is converted, it follows that he is entitled to the value of the grain at the time he made his demand therefor.

In the case at bar all the holders of storage tickets, except Lazier, had deposited their grain during the life of the bond sued on in this action. The record shows that they did not know that the defendant, Cook, was insolvent and did not make any demand for the grain until the spring of 1922. They testified to the value of the grain at that time and since they were entitled to the delivery of the grain to them in like quantity and quality, at the time of demand, and since there could be no delivery on account of the conversion of said grain, they were entitled to the value of the grain at the time of the demand in accordance with the findings of the trial court.

Upon the subject of value we find in the testimony of Chas. Getzluft, on page 10 of the transcript; after testifying as to the number of tickets held by him, and the demand made, the testimony is as follows:

Q. Was anything said as to what the value of the grain was on that day?

A. The grain was $1.08 a bushel that day.

Mr. Cupler: That is objected to for the reason that the witness is not shown competent to testify as to value, no foundation laid.

The Court: Overruled.

Q. And what was Mr. Cook paying for number one durum wheat that day?

A. One dollar and eight cents per bushel.

Mr. Cupler: Objected to as irrelevant and incompetent, and we move to strike out the answer on the ground that it is not binding on the sureties.

Q. Was that what all the elevators in Willow City were paying that day for like grain?

A. Yes sir.

There is no merit to appellant's objection; the witness is testifying to what the defendant, Cook, was paying for the grade of wheat represented by his storage tickets on that day, and that all the other elevators were doing the same. That is, the money that Mr. Getzluff would get for his wheat that day if it could be delivered to him. That was the day he wanted his wheat and made demand therefor, and since it was converted and could not be delivered to him he is entitled to recover from the defendant the amount that he would have received for the wheat in case of a delivery to him on that day, of like kind and quantity represented by storage tickets. This evidence also was re-enforced by a stipulation that the tickets showing the price of grain on the different dates of demand might be introduced in evidence.

As to the objection to the table of figures for the computation of the amount due the holders of storage tickets, the figures appear to be made up from the storage tickets and the cards which were introduced in evidence without objection. The same question was up in the case of Willard v. Monarch Elevator Co. 10 N. D. 400, 87 N. W. 996, and the court held that the value of the grain at the time of the delivery at the elevator was agreed on by stipulation of counsel, at the trial. No evidence at any other time was offered. It was also stipulated by counsel at the trial that the tickets for this wheat were turned over to one Jepson, but the stipulation was silent as to the time when so delivered. The trial court, without objection and pursuant to such stipulation, adopted the price of the wheat when delivered as the measure of damages. Held, that appellant can not urge, after the trial, that there was no evidence of value of the wheat at the time of the conversion. Since the case was tried upon this theory and evidence was introduced of the value of the property in April, 1922, without objection, there is no merit in appellant's contention. There is no question raised as to

whether the action was prosecuted with reasonable diligence after the ticket holders knew that the warehouseman was insolvent and could not redeem the tickets by delivering grain in like quantity and kind, or by payment of the same in money.

It may be said that the law, in relation to the storing of grain, implies the right to ship the stored grain out of the state to terminal elevators since it provides that grain of like kind, grade, and quantity, may be delivered to the ticket holder at the warehouse where the same was received or at a terminal elevator but it certainly does not contemplate a sale of the stored grain. The warehouseman who sells stored grain sells it without authority of law and at his peril. The bond is intended to insure the delivery of the stored grain in like quantity and grade.

The defendant Cook turned over to the sureties on the individual bond about $4,000 worth of notes, bills receivable and life insurance to be used for the redemption of the tickets issued during the life of the individual bond and the appellant claims the right of contribution between the sureties on this bond to the Northern Trust Company. The two bonds are separate and distinct from each other, each covering a different period of time, and the right of contribution does not obtain. The sureties on the individual bond should be held to a strict accounting to the district court and after the warehouse receipts issued under the individual bond are paid, any balance remaining in the hands of the sureties on said individual bond shall be turned in and deposited in court for the benefit of the appellant, the Northern Trust Company, which is entitled to be subrogated to any rights of the defendant Cook, and, as modified herein, the judgment of the district court is affirmed.

CHRISTIANSON, Ch. J., and JOHNSON, NUESSLE, and BIRDZELL, JJ., concur.