[File No. 6087.]

STATE OF NORTH DAKOTA ON THE RELATION OF FAY HARDING, et al., Board of Railroad Commissioners of the State of North Dakota, as Trustee of Isaac Hegge, an Insolvent Warehouseman, Appellant and Respondent, v. HOOVER GRAIN COMPANY, a Corporation, Respondent and Appellant.

(248 N. W. 275.)

Opinion filed April 22, 1933.

*Bangs, Hamilton & Bangs,* for appellant and respondent.

346

*McIntyre & Burlness,* for respondent and appellant.

Burr, J. The Board of Railroad Commissioners commenced this action on behalf of numerous persons who "deposited and delivered wheat for storage with Isaac Hegge, doing business as the Hegge Grain Elevator, and received therefor from time to time negotiable storage receipts issued by said Isaac Hegge." In the complaint it sets forth seven causes of action based upon the theory that the grain represented by the said storage receipts was converted by the defendant herein. Thus the board asks judgment against the defendant for $9,745.81 with interest.

The defendant entered a general denial and the case was tried to the court without a jury. The court made findings of fact in favor of the plaintiff, ordered judgment in the sum of $6,111.94 with interest, and from this judgment both parties appeal.

On the appeal plaintiff says that the judgment entered should be increased in the sum of $1,243.96 because of "storage charges improperly allowed the defendant."

The defendant says that the plaintiff is entitled to judgment in the sum of $4,669.13 only because the trial court held the defendant liable for "grain not represented by regular warehouseman's storage receipts outstanding," and that the defendant should have credit on account of "grain on hand in the elevator at the time of insolvency;" also on account of the grain sold immediately prior to surrendering the elevator; and "as to any and all grain, . . . on account of which the plaintiff is entitled to recover in this action, the defendant is entitled to have storage charges deducted." Failure to give these credits constitutes

348

the gist of defendant's appeal. There was some controversy over the amount paid upon a judgment against sureties; but both sides now agree this matter is not involved.

This action involves the provisions of chapter 156 of the Session Laws of 1927, providing a method for marshalling the trust assets of an insolvent warehouseman. Section 2 says that in case a warehouseman becomes insolvent "all the grain in said warehouse . . . the cause of action for damages upon any bond given by said warehouseman . . . and the cause of action for the conversion of grain stored in said warehouse shall constitute a trust fund for the redemption of outstanding storage receipts of such warehouseman." Section 1 of the act defines the word "receipts," saying such term "shall be held to mean and include grain warehouse storage receipts, and cash slips or checks given in redemption thereof. . . ." Section 3 authorizes the Board of Railroad Commissioners "to apply to the District Court of Burleigh County for appointment of itself as trustee of said fund. . . ." Section 4 of the act requires the Board of Railroad Commissioners, known as the "Commission," to inspect the books of the insolvent to ascertain the names of the holders of outstanding receipts, provides methods of giving notice to the holders whose names or addresses are unknown, and bars from participation in the fund such holders of receipts who have not surrendered them to the commission within the time prescribed. Section 6 debars any receipt holder from bringing "a separate action against said bond, or insurance, or said person converting said stored grain, or against any other receipt holder excepting through said trustee . . . unless, . . . the commission shall fail or refuse to apply for its own appointment as trustee . . . nothing shall be construed to . . . prevent any receipt holder . . . from pursuing . . . such other remedy as he . . . may have against the person or property of such warehouseman, for the whole, or any deficiency occurring in the redemption of said receipts." Thus the insurers, bondsmen, and those charged with conversion of the grain are the persons from whom the Commission wants to recover and they are protected from further suit after the expiration of the time stated.

Section 5 provides that when the Commission ascertains the names and addresses of receipt holders and the amount of grain represented

by such receipts and the said receipts have been delivered to it the Commission may maintain action "for the benefit of all such receipt holders, against the insurers of said stored grain, against the warehouseman's bond, against any person who shall convert any of such stored grain, or against any receipt holder who shall have received more than his just and pro rata share of said stored grain, for the purpose of marshalling all of the trust assets of said insolvent warehouseman and distributing same among said receipt holders. Provided, however, that the remedy against the insurers of said stored grain shall be first exhausted before recourse is had against said bond, and against said bond before recourse is had against the person honestly converting such grain, unless in the judgment of the Commission it shall be deemed necessary to the redemption of said storage receipts, that all the above remedies be pursued at the same time."

The required notice was given receipt holders. No issue arises over insurance on the grain, or because of any method pursued.

Most of the facts are not in dispute. When the Commission took charge of the elevator Hegge was owing for grain represented by storage tickets, scale tickets and "assembling sheet," which at the stipulated prices amounted to $7,169.68. Of this amount grain to the value of $473.70 had been sold by Hegge to parties other than the defendant, and grain found in the elevator and valued at $553.14, was credited on these claims. The remainder of the grain was sold to defendant or its order. The amount of this grain delivered to the defendant was $6,143.04; there being an unaccountable discrepancy of $31.10 in the judgment. On or about July 20, 1927, plaintiff made demand upon the defendant "for possession of the stored grain or for payment" and it was agreed thereafter "that the value of the grain involved, on that date" was as shown by one of the exhibits introduced.

There were also on hand 438 bushels of No. 1 durum and defendant, claims it is entitled to credit for the value of this grain. The evidence shows, however, that plaintiff is not seeking to recover from defendant for any No. 1 durum. Plaintiff does not claim defendant converted any No. 1 durum. The plaintiff is claiming defendant converted spring wheat, oats, barley, flax and rye, and the judgment rendered against the defendant is for such grains.

This action is for conversion of certain grain, and defendant must

pay its value or so much thereof as is necessary to pay the claims of the holders of the "receipts" for the kind and quality of grain said to be converted. The holder of these "receipts" has an interest in "the grain of the kind and quality described in his receipt that may at any time subsequent to the issuance be received on account of purchase or general storage into the warehouse." Carson State Bank v. Grant Grain Co. 50 N. D. 558, 197 N. W. 146; Kastner v. Andrews, 49 N. D. 1059, 194 N. W. 824.

The record shows that there were outstanding storage tickets for durum wheat valued at about $305.20; that the plaintiff found in the elevator durum wheat worth $525.60 and took charge of the same. After paying the outstanding storage tickets there was therefore a surplus of $220.40 which plaintiff had to apply upon Hegge's debts for grain delivered to the defendants. As the defendant was asked to respond for this grain, and as there is no claim against it for durum, the defendant is entitled to this credit of $220.40.

The trial court permitted the plaintiff to recover for grain, which the defendant says is not represented by "receipts" as defined by the statute. The statute already quoted (§ 1, chapter 156 of the Session Laws of 1927) defines the "receipts" for which the defendant is liable.

Plaintiff sought to prove by means of documentary evidence the quantity of grain for which it claims the defendant liable. A large number of exhibits were introduced, objections being made to Exhibits 45 to 58a inclusive.

Exhibit 50 is a written statement signed by one R. S. Dean, under date of April 29, 1927, showing one Vastedt had unloaded some durum wheat in the elevator of Hegge. D. was not in any way connected with the elevator, but V., being anxious to dispose of the grain, went to the elevator and finding no one there, called on D. to supervise the weighing. He then dumped the wheat in the elevator. D. signed the statement certifying that the wheat was unloaded under his supervision, and that he weighed it. No scale ticket or cash slip or storage ticket was ever issued for it. V. never asked for a storage ticket for it —never had any conversation with Hegge about it. That Hegge got the grain and probably disposed of it is shown by the evidence; but there is nothing in the transaction which shows Hegge knew anything about it. When he shipped out grain he probably shipped this load.

Defendant cannot be held liable for it. The grain represented by Exhibit 50 should not be charged to the defendant in this case.

Exhibits 45 and 58 are what are known as "assembling sheets," and Hegge says these are part of the records kept by him in the grain business.

Exhibit 45 is a document under date of January 31, 1927, showing the name of one Hanson and purporting to be a statement of loads of rye purchased from W. Hanson. It has a column headed "Scale ticket number." On the lines in this column appear the figures 1504-7-9-10-12-14-16-17-18-19-20-21-23-24 and the record shows this to mean scale ticket 1504–1507, etc. In an appropriate column is found the weight of the load represented by the scale ticket whose number appears in the same line.

Exhibit 58 is similar in character to 45 and shows the number of scale tickets that were issued for sixteen loads of grain. The record shows no "grain warehouse storage ticket" was issued for any of these loads. Scale tickets were issued, however. It is the contention of the defendant that, so far as it is concerned, the value of the grain described on this assembling sheet can not be considered in determining its liabilities, even though it may be shown that such grain was purchased by it.

Hegge's explanation is that when a man delivered grain and sold part it was customary to issue storage tickets for the remainder; that it was usual for customers to haul in a few loads of grain with a short time between loads; and when through hauling storage tickets were issued for the amount not sold; that they would not ask for storage tickets at the time, and usually told him to wait until they brought in whatever grain they were going to deliver; that when storage tickets were asked for he would issue the tickets. With reference to the grain described on these "assembling sheets," the record shows clearly that the grain was hauled in and scale tickets issued; that Hegge did not pay for the grain nor issue storage tickets. The scale tickets were not introduced in evidence; the "assembling sheets" being merely a statement of the grain represented by certain scale tickets described thereon. The defendant objected to the introduction of these exhibits on the ground that they were incompetent, but the basis of the incompetency specified is that defendant was not liable unless storage tickets or cash slips were

issued. The objection of incompetency was not based on the ground that the scale slips themselves were not introduced in evidence, and there is no contention that these exhibits did not accurately show the contents or that scale tickets were not issued, or were not correct. We assume that the objection is not leveled at the fact that the scale tickets themselves were not introduced in evidence; but rather that even if they were, the defendant would not be liable for the grain described therein. Exhibits 46 to 49, 51 to 57 inclusive, and 58a are scale tickets issued to customers and the objection is made that they are incompetent because the defendant is not liable except for storage tickets.

The evidence shows clearly that such grain was received by Hegge, but not paid for. The warehouseman agreed to issue storage tickets therefor, but failed to do so. Those entitled to receive the warehouse receipts asked for them from time to time; but for some reason or other they were put off. The trial court found that all such grain was delivered for storage and that the failure to issue the storage tickets was solely the fault of Hegge. Defendant says in effect that while, as between the seller and Hegge, the liability of Hegge may be the same as if storage tickets were in fact issued, nevertheless under the provisions of the law involved this action can not be maintained against it unless "receipts" were in fact issued.

The action is brought under the terms of the statute involved and the judgment to be rendered must be governed by the provisions of this law. This statute authorizes judgment for and on behalf of such receipt holders as surrender their receipts and the term "receipts" has a definite meaning.

It is clearly the intent of the legislature, however, that this law shall be comprehensive enough to settle the legitimate demands of owners of grain delivered to an insolvent elevator company, against those who have liability because of such grain—an insurance company in case grain is destroyed, a surety on a bond in case grain is not paid for, and those liable for the conversion of the grain. The law was intended for the benefit of the claimants and must be construed with sufficient liberality to effectuate its purpose without doing injury to those who are liable. It cannot be said that giving a reasonably liberal construction to the term "receipts," is unfair to those who converted the grain, if in fact there is a legitimate claim for such grain.

It is true that the statutory definition of "receipts" does not say "scale tickets." The term includes "cash slips," however. No definition is given to the term "cash slip." There is nothing in the record which shows that it has a meaning peculiar to the trade or that it should be interpreted in any sense other than what the words would mean ordinarily. There is no testimony showing that in any way it differs from the term "scale tickets." The term is found in the clause "and cash slips or checks given in redemption thereof." Evidently the legislative understanding is that "a cash slip" is a memorandum which on its face shows it is issued for grain and gives the kind, quality, quantity, and date of delivery. It does not appear to be a document which on its face purports to express the exact amount due, for apparently the legislature understood that cash would be delivered or a check issued to pay for the grain described therein. There is nothing in the term to show that it would exclude such a document as a "scale ticket." The scale tickets introduced give the quality and quantity and kind of grain delivered; they show the amount of dockage and the date of delivery. They have all of the essential elements necessary for a storage ticket. The price is not specified therein; but it is clearly the intent that when presented to the buyer he will either pay cash, give a check "in redemption thereof," or a storage ticket. When we consider the purpose of the act and the character of these exhibits known as "scale tickets," we conclude that they are of the kind intended by the legislature to be included in the term "receipts."

The trial court found that the holders of the scale tickets demanded storage tickets for the grain. The evidence sustains the finding. The value of the grain was fixed as of the date of the demand on the theory that storage tickets should have been issued at that time. We do not know what was the price of the grain at the time the scale tickets were issued; but there is no objection made by the defendant on the ground that it was less than the price at the time of demand, nor is there any claim that the price should be ascertained as of the date of the scale ticket. The whole attitude of the defendant is that, if liable for the value of the grain represented by the scale tickets, the value found by the court is correct. The trial court was right in holding that the grain represented by these scale tickets is protected by the provisions of this law involved.

354

The remaining issue deals with the right of the defendant to claim storage charges as an offset against any judgment rendered against it. The defendant says that if the defendant is to be held liable for the grain represented by the exhibits in dispute—assembly sheets and scale tickets—then it is entitled to deduct from the fund the amount of storage which could be claimed legally had tickets been issued. The plaintiff says that in this case the defendant is not entitled to deduct any storage charges on grain whether the grain be represented by storage tickets or scale slips.

Defendant concedes it converted grain. The insolvent testified that no request was made to him to issue storage tickets for this grain. The trial court refused to allow storage charges for grain not represented by storage tickets; but apparently allowed storage charges for the grain represented by storage tickets. Plaintiff says no such storage charges should be allowed and that the defendant is not entitled to the amount as an offset.

We need not determine whether a warehouseman may charge for storage when no tickets were issued.

It is argued that there is no proof of the time when the conversion took place, except possibly such proof as is warranted by reason of a stipulation entered into between the parties at the time of trial, and therefore the defendant is entitled to a credit in the amount of the storage charges as fixed by law.

The stipulation referred to is as follows: "It is stipulated and agreed that demand was made on behalf of the plaintiffs on the Hoover Grain Company on or about July 20, 1927, for possession of the stored grain, or for payment, and that the value of the grains involved on that date shall be as shown by plaintiff's exhibit 50."

This stipulation, however, does not purport to fix any date for conversion.

A warehouseman converts grain held for storage when "he ships it out and sells it without substituting other grain," though his default may be cured if before demand "other grain of like kind and quality is procured and substituted therefor." State ex rel. Hermann v. Farmers' Elevator Co. 59 N. D. 679, 231 N. W. 725; Stutsman v. Cook, 53 N. D. 162, 204 N. W. 976.

The record shows conclusively that the insolvent, upon the receipt

of grain for storage, sold it to the defendant, had the proceeds applied on his indebtedness and no other grain of like kind and quality was procured and substituted therefor.

Our holding is somewhat different from the cases cited from the South Dakota Court such as South Dakota Wheat Growers' Asso. v. Farmers' Grain Co. — S. D. —, 237 N. W. 723, where the holding is that conversion does not take place until failure or refusal to deliver on demand. Hence this rule in the South Dakota cases does not apply in this jurisdiction.

The grain was not kept in storage. It was sold wrongfully. The record is precise on this point. There was not the least evidence offered to show that even "hedging" was attempted and defendant does not claim it kept any grain in storage. It admits the tort. It may be true, as defendant urges, that the law does not contemplate that a warehouseman shall keep the grain in the warehouse; nevertheless he is required to keep the grain so that he can return the like kind, quantity and quality. The record in this case shows that the insolvent does not claim that at any time after receiving the grain he could have done so.

No witnesses were produced by the defendant. The insolvent testified that from a period prior to August, 1921, and down to the time he closed his elevator he was indebted to the defendant, and this indebtedness at the time of closing "showed around twenty-three or twenty-four thousand dollars." Prior to August, 1921, he had the cut off with defendant and for the five years prior to the closing of his elevator the defendant examined and audited his accounts. Practically all of the grain he received he shipped to the defendant and the proceeds were applied upon the insolvent's debt. He testified that he had dealings with one C. Mills and Mills & Holman during the years of 1921 and 1922, involving approximately 227 bushels of barley and 173 bushels of wheat represented by six storage tickets, but that he did not show these to the defendant, but rather covered them up.

The record is very clear that during all of the time involved the defendant shipped the stored grain to the company as payment on his debt, and the time of shipment was the date of the conversion. In fact, on the trial of the case, the counsel for the defendant said: "We do not dispute the fact that the Hoover Grain Company got the grain out of this Grain Company, with the exception of the amounts he put in:

the record before the closing of his case and sold to the Monarch Elevator Company and sold to the Farmers Elevator Company, and the amount of grain at the time the elevator closed that was to be applied to storage."

There was no attempt made by the defendant to show how long the grain remained in Hegge's elevator before it was shipped to it. The testimony is vague as to whether this shipment was immediately on receipt or shortly thereafter. It is true the storage tickets represented a contract between the insolvent and the producer, and if the insolvent kept the grain on storage he was entitled to charges according to his contract. But no charges can be made for the first twenty days of storage, if sold within that period. See § 18, chapter 155 of Laws of 1927.

But the charges mentioned in the tickets are merely the charges which he is entitled to make if he fulfills his contract. There is no magic in the tickets themselves showing the contract is performed. Nor are they evidentiary facts showing the contract completed. Despite the requirements of his contract as evidenced by the storage tickets the insolvent violated his contract. Clearly the insolvent did not keep grain on storage, nor did he replenish the mass. The defendant can not claim storage charges other than the insolvent could charge.

In Stutsman v. Cook, supra, we laid down the principle that where the "insolvent warehouseman ships and sells all of the grain stored in his warehouse, leaving none for the redemption of warehouse tickets, and the surety company, liable on bond for the grain so sold and converted, claims that the common mass of grain in the elevator was replenished . . . and that on account therefor the former conversion was waived . . . the burden is on such surety company to prove the replenishment, in whole or in part. . . ." Here it is conceded there was conversion, conceded that the defendant got the converted grain and it is proven there was no "hedging" nor replenishment. We can not close our eyes to the fact that a small elevator, accepting grain during the busy season, can not keep very much grain on hand in the elevator and do business. The warehouseman must ship it out, and from the testimony of the insolvent, as soon as he shipped it out it was applied upon his debts. Admittedly he broke his contract. If he is entitled to storage charges the burden is upon him to show the amount

and this burden rests with equal weight upon the shoulders of the defendant.

In the case at bar the grain was converted at the time of shipment and there is no evidence from any source showing there was ever any replenishment. The record also is silent as to any agreement between the insolvent and any commission house to furnish grain at any time and take up any storage tickets. As said in Stutsman v. Cook, 53 N. D. 162, 182, 204 N. W. 976, giving the right to ship stored grain to terminals "does not contemplate a sale of the stored grain." But this implies that the grain was stored at the terminal. Neither did the defendant offer any proof to the effect that it could have furnished the grain at any time. The partner in the tort has no greater rights than the one who converts the grain.

Appellant cites Huether v. McCaull-Dinsmore Co. 52 N. D. 721, 204 N. W. 614, as authority for his right to deduct storage charges; but an analysis of this case shows that it is not in point. There is nothing which indicates that the grain involved therein was converted at the time of delivery, or that any issue was raised over the right to charge storage under such conditions. Hence there is nothing in the case cited which indicates that a warehouseman is entitled to storage charges for storage services never rendered.

It is claimed that where the warehouseman converts grain received by him for storage, and fails to replenish the mass so as to be in position to deliver grain of the same kind and quantity when demanded, he is not entitled to storage charges for any period and by the fact of the conversion has waived a lien for any storage charge. We are not called upon to decide such proposition in this case, and so expressly refrain from so doing.

The judgment is modified by deducting from the amount the value of the grain represented by exhibit 50, and by giving to the defendant credit for the surplus of proceeds of durum wheat, and by adding to the judgment the amount deducted by the trial court for storage charges.

With the modifications herein indicated the judgment of the lower court is affirmed.

NUESSLE, Ch. J., and CHRISTIANSON, BIRDZELL and BURKE, JJ., concur.