Silver ZIEBARTH, Plaintiff
and Appellee,

v.

LeRoy KALENZE, Jr., Defendant
and Appellant.

Civ. No. 9104.

Supreme Court of North Dakota.

Jan. 2, 1976.

whereas the subject matter of the contract, the cattle, was no longer available, making specific performance impossible. The district court denied the motion.

Kalenze appeals to this court from the judgment entered on October 23, 1974. He demands a new trial at law on the issues of liability and damages. He also appeals from the order of the district court denying his 41(b) motion to dismiss, and asserts that he was deprived of a jury trial on the issue of damages because of the denial of the motion. He never filed a demand for a jury in the trial court.

The issues on appeal are: (1) Did the lower court err in denying the defendant's motion to dismiss when it became apparent that specific performance was not possible as a remedy?. (2) Was the decision of the lower court clearly erroneous in finding that the parties extended the time of delivery of the calves? (3) Was the decision of the court clearly erroneous in finding as a fact that the defendant Kalenze breached the contract by selling the calves to a third party?

McGee, Hankla, Backes & Wheeler, Minot, for plaintiff and appellee; argued by Richard H. McGee, Minot.

Bosard, McCutcheon, Kerian, Schmidt & Holum, Minot, for defendant and appellant; argued by Jon R. Kerian, Minot.

VOGEL, Justice.

This case originated in the district court, Ward County, North Dakota, on a claim for equitable relief based upon contract. The plaintiff-appellee, Silver Ziebarth, a cattle buyer, sought specific performance of a contract for the sale of cattle from the defendant-appellant, LeRoy Kalenze, a rancher in the business of selling cattle.

The district court, without a jury, found for Ziebarth. The court awarded damages in the sum of $4,589 plus costs in lieu of specific performance. Kalenze moved under Rule 41(b), N.D.R.Civ.P., at the end of the plaintiff's case, for dismissal of the action on the ground that the pleadings asked for specific performance of the contract,

On June 16, 1971, Ziebarth and Kalenze entered into a written contract. Ziebarth agreed to purchase all of the Simmental heifer calves produced from Kalenze's cows which were to be artificially inseminated with Simmental semen furnished by Ziebarth. Ziebarth furnished the contract form, which provides, in part:

"1. Buyer [Ziebarth] shall furnish Seller with a total of __160__ ampules 60 Bismarck of __48 M13 32 Eiger__ semen having an agreed value of 10. & 15. per ampule. Buyer agrees to pay __All.__ % of semen costs until authorized pregnancy test or upon purchase of calves.

"2. Seller agrees that he will artificially breed not less then [sic] __175__ mature cows with the above semen during the 19__71__ breeding season. All brood cows so inseminated shall be identified by Seller with tag, neck chain, or other ap-

propriate identification acceptable to Buyer.

"3. Seller shall keep adequate records showing birth dates of each calf and dam of calf. Calves shall not be number branded. Seller shall retain all crossbred *Simmental* calves until Buyer purchases the same as hereinafter mentioned.

"4. Seller agrees that any cows inseminated pursuant to this agreement cannot be sold during the term of this agreement without consent of the Buyer.

.    .    .    .    .

"6. Buyer agrees to purchase (ALL) ( 100 % of all) crossbred *Simmental* heifer calves at the price of ___ cents per pound in excess of the then prevailing market price of straight bred commercial Angus or Hereford Heifer Calves, whichever price is the greater or $ 260.  per head for crossbred *Simmental* heifer calves

.   .   .

"7. Delivery shall be at about seven (7) months of age or at least 450 pounds, no earlier then [*sic*] October 15 or no later then November 15. Buyer reserves the right to refuse any sick or maimed calves. Delivery shall be made at Buyer's expense."

Twenty-six heifer calves were produced from the artificially impregnated cows. Several telephone communications occurred between the parties during the period of the contract and after the contract dates. What the parties said in these conversations is the subject of some dispute in this case. The parties at no time met each other in person after the contract was signed. There had been no prior dealing between the parties.

The testimony at trial establishes that Kalenze began weaning the heifers on October 25, when the veterinarian gave the calves preconditioning shots. He brought the calves out of the pasture and put them into corrals on the farmstead. The calves were fully weaned about a week later, in early November. Kalenze informed Zie-

barth on November 8 or 9 that the calves were "in"; "and they had their shots, and on preconditioned feed, and they were ready to go, so he could pick them up."

As the contract and the testimony at trial indicated, the buyer, Ziebarth, assumed all the obligations of delivery of the calves. He was "to come with a truck, pick them up," and "deliver the money."

The seller's obligation to "deliver" the calves was merely to retain the calves so that Ziebarth could pick them up at the Kalenze farmstead. Ziebarth apparently made no attempt to pick up the cattle on or before November 15, the date specified in the contract as the final delivery date.

There is dispute between the parties as to the content and dates of the subsequent conversations. Ziebarth contends that "at the end of November" the weather turned bitterly cold and he decided it would be necessary to wait until the weather modified to pick up the calves. Ziebarth testified that Kalenze agreed "to wait until the end of the week, or later, to see if the weather wouldn't modify," and "as soon as the weather modified we'd pick them up." The date of this telephone conversation is unclear, but it appears to have taken place in early December.

Ziebarth claims that in this conversation the parties discussed the fact that Ziebarth still had the opportunity to pick up the calves, but since the contract had run past the 15th of November, some reimbursement for feeding costs was necessary. Ziebarth admits that no set price was established for the feed costs, Ziebarth offering 25 cents per day head cost, Kalenze asking about 50 cents per day. Ziebarth maintains that this conversation constituted an oral modification of the contract and that the time for delivery of the cattle was thereby extended beyond the contract date.

According to Ziebarth, the next conversation between the parties occurred when he called Kalenze on December 15 or 16, stating that he was sending a truck to pick up the calves. Kalenze told Ziebarth at that

time that he would not deliver the calves to Ziebarth and there was "no use coming." Kalenze told Ziebarth that Ziebarth had breached the contract, that Kalenze had received a much better offer, and "it would take a lot more money to buy them at that time." Ziebarth claims that Kalenze breached the contract when he sold the calves to another party for $450 per head. (Note: Ziebarth in his brief claims the breach occurred on December 12, 1972, whereas the testimony in the record puts the sale of the calves on December 23, 1972.)

Kalenze, on the other hand, contends that the weather in the month of November in 1972 was generally good and did not turn bad until around the end of November or the first part of December. In his testimony Kalenze stated that there was no reason "weatherwise" why the cattle could not have been trucked on the 15th of November. Kalenze contends that Ziebarth breached the contract by failing to pick up the calves within the contract term. However, Kalenze's testimony on this point is · ambiguous:

(Cross-examination of LeRoy Kalenze)

"Q. Was there any discussion between you and Ziebarth that the cattle couldn't be picked up by the 15th of November?

"A. No.

"Q. There wasn't. After the 15th of November, was there any discussion? Well, let's say up until the tail end of November when it started getting cold, was there any discussion that the 15th of November had run by?

"A. Around the end of November there was.

"Q. Around the end of November you discussed that?

"A. Yes.

"Q. And what were you concerned about at that time?

"A. Well, feed costs, and holding the cattle that long. I had my other cattle in there.

"Q. I see. You were discussing feed costs then with Mr. Ziebarth towards the end of November?

"A. Yes.

"Q. At that time, did you still consider you had a contract with him to deliver the heifers to him?

"A. I figured after the 15th the contract was void.

"Q. You figured it was void after that, and you were—

"A. But I was giving him on account of the weather.

"Q. On account of the weather, you were giving him the opportunity to still pick them up?

"A. (Shakes head 'yes')."

Kalenze contends in testimony and in his brief that he treated the contract as void after November 15 and he was merely negotiating with Ziebarth after that time as to the sale of the cattle. He contends that he was giving Ziebarth the opportunity to buy the cattle, but he was also open to offers from others. Kalenze claims that Ziebarth told him at least twice that he was going to pick up the cattle but that Ziebarth did not do so. It is agreed by both parties that at no time did Ziebarth tender any payment for the calves.

The first issue to be decided in this appeal is whether the trial judge erred in denying the defendant's motion to dismiss under Rule 41(b), N.D.R.Civ.P., when it became apparent that the specific relief prayed for in the plaintiff's complaint was impossible to grant as a remedy.

The plaintiff Ziebarth brought this case in equity, demanding specific performance of the contract at the agreed price pursuant to the remedies available to a buyer under the Uniform Commercial Code,[1] Section 41–

1. The Uniform Commercial Code governs this transaction because a contract for the

sale of the unborn young of animals falls within the Code definition of a contract for

02–95, N.D.C.C. (UCC § 2–716). This section provides, in part:

"1. Specific performance may be decreed where the goods are unique or in other proper circumstances.

"2. The decree for specific performance may include such terms and conditions as to payment of the price, *damages*, or other relief as the court may deem just." [Emphasis supplied.]

The Code clearly allows the court to grant damages in an action by a buyer for specific performance, *in the court's decree* for specific performance. It is not clear, however, whether the Code allows damages to be awarded *in lieu of a decree* in equity. This case presents the unusual circumstance of a case brought in equity in which specific performance was not possible: The subject matter of the contract had been sold to a third party prior to commencement of the suit. It is not apparent from the pleadings or the testimony whether the plaintiff in this case knew that specific performance was impossible at the time he pled his case in equity.[2]

■ Of course, the defendant knew when he was served with process that specific performance was impossible, but he did not mention that fact in his answer. If the plaintiff had known that damages, and not specific performance, was the proper remedy—in fact, the only remedy available in this case—and had made the appropriate motion to amend, then the trial court should have allowed the plaintiff to amend his pleadings to conform to his remedy at law or dismissed the suit in equity. *Knudtson v. Robinson*, 18 N.D. 12, 118 N.W. 1051 (1909). As this court stated in *Tower City Grain Co. v. Richman*, 232 N.W.2d 61, 66 (N.D.1975):

"A complaint which prays for the equitable remedy of specific performance must clearly show that the legal remedy of damages is inadequate. A defendant should not be deprived of a jury trial, to which he would be entitled in an action at law, unless the plaintiff is clearly entitled to the equitable remedy he seeks."

The case law on the issue of the court's jurisdiction to grant damages in lieu of the equitable relief prayed for is conflicting. Some courts recognize the doctrine of substituted legal relief in equity. Historically, where the ground for equitable relief failed, the bill in equity was dismissed and the parties were left to seek in the common-law courts whatever legal remedies remained. But in 1786, an equity court did not dismiss the bill, but retained jurisdiction for granting legal relief where specific performance failed only because of the defendant's wrongful conduct after the suit was begun. This became the basis for granting substituted legal relief in equity. James, *Right to Jury Trial in Civil Actions*, 72 Yale L.J. 655, 659 (1962). In order for the doctrine to be applied in a particular case, however, the plaintiff must first establish his right to equitable relief, to which damages might then be incidental or subsidiary. See *Graven v. Backus*, 163 N.W.2d 320 (N.D.1968). In *Raasch v. Goulet*, 57 N.D. 674, 223 N.W. 808 (1929), this court held that the right to recover damages under the doctrine of substituted legal relief (or equity's "clean up" jurisdiction, as it is sometimes referred to) depends on the right to specific performance and is not available until the latter is established.

■■ It is thus the rule in some jurisdictions, and the traditional view, that the court cannot give judgment for damages in an action brought in equity unless the plaintiff first proves his right to equitable relief. *Jourdon v. Commonwealth Co.*, 169 Neb. 482, 100 N.W.2d 84 (1959); *Morgan v. Dibble*, 43 Cal.App. 116, 184 P. 704 (1919). There is language in *Raasch v. Goulet, supra*, 223 N.W. 808, at 817, to support this

the sale of "goods" under Section 41–02–05, N.D.C.C. (UCC § 2–105).

2. The cattle were sold on December 23, 1972; the complaint was filed on January 22, 1973.

rule of "substituted legal relief." But we decline to follow this rule of the common law, and to the extent that *Raasch* indicates acceptance of it, we overrule it. In our view, the fusion of law and equity, which has been the law of North Dakota since Statehood, and the law of the Territory of Dakota from the time of its adoption of the Field Code of Civil Procedure at the first legislative session in 1862, puts the authority to grant equitable or legal relief in courts of general jurisdiction, regardless of technicalities such as the rule of "substituted legal relief." Early judges, trained in common-law pleading, were perhaps unwilling to accept the fusion of law and equity at face value [see, for example, *Jasper v. Hazen*, 2 N.D. 401, 51 N.W. 583 (1892)]. More recently, however, we have at least followed the "clean up jurisdiction" theory [*Graven v. Backus, supra*, 163 N.W.2d 320, at 327], and we have held that the existence of a remedy at law does not preclude equitable relief if the equitable remedy is better adapted to render more perfect and complete justice than the remedy at law. We believe that a legal remedy should be granted where equity fails. It would involve needless waste of time and money to send the case back for repleading and retrial to accomplish the same result we have now before us. We prefer to follow the rule stated in *Livingston v. Krown Chemical Manufacturing, Inc.*, 50 Mich.App. 153, 212 N.W.2d 775 (1973), and allow damages even though specific performance is denied.

■ The holding of the two preceding paragraphs, of course, is limited to cases where the rules stated in them do not operate to deprive a litigant of a right to a jury trial. The distinction between law and equity is still of primary importance in determining the right to a jury trial. But a jury trial can be waived by failing to demand it. Rule 38(d), N.D.R.Civ.P.; *Canister Co. v. Leahy*, 182 F.2d 510 (3d Cir. 1950).

■ In the present case, it is apparent that the defendant knew that specific performance was impossible when the complaint was served on him. He therefore must have known that the only possible remedy, if the plaintiff prevailed, would be damages. If so, he knew he had a right to a jury trial. The right to a jury trial, if demanded under the facts of this case, would be absolute. N.D.Const. § 7; Wright & Miller, Federal Practice & Procedure § 2302; *Tower City Grain Co. v. Richman, supra*. The defendant could have demanded a jury trial, even though the complaint on its face showed grounds for equitable relief only. *Crane Co. v. American Standard, Inc.*, 490 F.2d 332 (2d Cir. 1973); *Gulbenkian v. Gulbenkian*, 147 F.2d 173 (2d Cir. 1945). At a hearing on a motion based on the demand for a jury, the defendant could have shown his right to a jury trial and the trial court would have erred if it had refused to order the jury trial. But in the absence of a demand, there was no error. *Crane Co. v. American Standard, Inc., supra*; *Canister Co. v. Leahy, supra*. The trial court decides which cases are triable by a jury by examining the complaint [*Kilgore v. Farmers Union Oil Co.*, 74 N.D. 640, 24 N.W.2d 26, 31 (1946)] or the face of the pleadings [Wright & Miller, Federal Practice & Procedure § 2304]. Even if the complaint shows a cause of action entitling the defendant to a jury trial, the right to a jury is waived unless demanded. Rule 38(d), N.D.R.Civ.P. We hold today that the right to a jury trial is likewise waived if not demanded in a case where the complaint demands equitable relief but the defendant is aware that only legal relief could be granted if the plaintiff should prevail. Or, as Professor James puts it, in 72 Yale L.J., *supra*, at 677, 678:

> ". . . . waiver of jury trial under statute or rule will not be relieved against because of the emergence of legal claims based on facts which were pleaded at the time of the waiver. In the usual case plaintiff claims specific performance of a contract which he claims was breached; defendant denies the contract, or the breach or both and claims specific performance is inappropriate anyhow. In

this situation it is perfectly foreseeable to defendant that if the court should agree with his own claim about the inappropriateness of specific performance, the pleaded facts present a legal issue. Armed with this chance for foresight, defendant should not be allowed to withhold his jury claim without waiver."

*Accord, Gulbenkian v. Gulbenkian, supra; Moore v. United States*, 196 F.2d 906 (5th Cir. 1952).

The second issue which must be decided is whether the trial court erred in finding that the parties extended the time for delivery of the calves. The plaintiff argues that Kalenze and Ziebarth altered the written contract by means of an executed oral agreement within Section 9–09–06, N.D. C.C. According to his argument, this agreement occurred when the parties agreed that Kalenze was to be reimbursed for his maintenance and feed costs for the time period beyond November 15.

At the outset, it should be noted that there may be a question as to whether this case falls within the provisions of the Uniform Commercial Code relating to modification of contracts [§ 41–02–16, N.D.C.C. (UCC § 2–209)] rather than Section 9–09–06, N.D.C.C., which governs contracts not within the UCC. See *Cargill, Inc. v. Kavanaugh*, 228 N.W.2d 133 (N.D.1975). It is unnecessary for the purposes of this case to consider the question at this time.

■ Examination of the record reveals no agreement by the parties, executed or otherwise, either for the extension of time for delivery or for reimbursement of Kalenze for his maintenance costs. Kalenze's testimony on the subject, quoted above, is ambiguous, but cannot be held to constitute an agreement to extend the time for delivery. Kalenze's statement that he was "giving him on account of the weather" is equally susceptible to the interpretation that even though Kalenze considered the contract void, he would still give Ziebarth the opportunity to pick up the calves.

Kalenze's conduct throughout the period was consistent with a belief that the contract was breached by Ziebarth after November 15, 1972. He may have been willing to sell to Ziebarth because it was necessary to sell as soon as possible to avoid further expenses involved in maintaining the calves. But he was also willing to sell to another party if he received a better offer. He informed Ziebarth that he considered the contract void and of his intention to sell to another party in mid-December.

Ziebarth's argument that the parties' discussion of reimbursement for maintenance costs was an oral agreement altering the written contract is without merit. There is some evidence of telephone conversations between the parties concerning compensation due to Kalenze for his expenses in keeping the cattle past the contract due date. But the record is clear that no new contract (which might possibly have modified the original contract) was ever entered into. We see nothing in the record except the opening negotiations for such a reimbursement agreement, negotiations which never solidified because no price was ever agreed upon. In fact, Kalenze demanded twice the compensation that Ziebarth offered to pay.

The next issue is whether the trial court erred in finding that the defendant breached the contract by the sale of the calves to a third party. The defendant seller argues that since Ziebarth breached the contract by his failure to pick up the calves within the contract period or within a reasonable time thereafter, the seller was free to sell to another buyer.

In order to determine the relative rights of the parties it is necessary to look first to the provisions of the contract. The written agreement calls for delivery no earlier than October 15 or no later than November 15. The trial judge made no finding as to whether the parties intended time to be of the essence of the contract, and we refrain from making such a determination on this

appeal. See *Mott Equity Elevator v. Svihovec*, 236 N.W.2d 900 (N.D.1975); *Farmers Elevator Co. v. David*, 234 N.W.2d 26, 31 (N.D.1975).

█ Even if time is not of the essence of this contract, it was nevertheless incumbent upon the buyer to pick up the calves within a reasonable time. Sec. 41–01–14, N.D.C.C. (UCC § 1–204).

█ Considering all the circumstances of this case, we hold that the buyer's delay of approximately 30 days before his offer to pick up the calves was unreasonable. During this period of time Kalenze bore the risk of casualty to the calves and, in fact, one of the calves died while Kalenze was waiting for Ziebarth to perform. Also, Kalenze was required to feed and shelter the calves for an entire month beyond the date contracted for. During this time, no agreement had been reached as to compensation to Kalenze for his costs and inconvenience.

█ Based on our recent holding in *Mott Equity Elevator v. Svihovec, supra* (in which the issues resemble the issues in the present case), we hold that since Ziebarth breached the agreement by not picking up the calves within a reasonable time, Kalenze had the right to cancel the contract and sell the calves to a third party. Sec. 41–02–82(6), N.D.C.C. (UCC § 2–703).

The trial court did not err in denying the defendant's motion under Rule 41(b), but we find that the court clearly erred in holding that the parties agreed on an extension of time for performance and that Kalenze breached the contract by selling the calves to a third party.

Reversed and remanded for further proceedings consistent with this opinion.

ERICKSTAD, C. J., and SAND, PAULSON and PEDERSON, JJ., concur.