NORTH DAKOTA PUBLIC SERVICE COMMISSION, Petitioner,

v.

VALLEY FARMERS BEAN ASSOCIATION, Respondent.

STATE of North Dakota ex rel. NORTH DAKOTA PUBLIC SERVICE COMMISSION as Trustee for the Benefit of Outstanding Receipt Holders of Valley Farmers Bean Association, Plaintiff and Appellee,

v.

MILLERS NATIONAL INSURANCE COMPANY, Defendant, Third Party Plaintiff and Appellant,

v.

Joseph F. LARSON, Myron Brieland and Norman Erickson, Third Party Defendants and Appellants,

First State Bank of Buxton, Buxton, North Dakota, First and Farmers Bank, Portland, North Dakota, and Bank of North Dakota, Bismarck, North Dakota, Appellants.

Civ. Nos. 10768, 10769, and 10789.

Supreme Court of North Dakota.

March 27, 1985.

Conmy, Feste, Bossart, Hubbard & Corwin, Fargo, for Millers Nat. Ins. Co.; argued by Wickham Corwin, Fargo.

Bruce E. Bohlman, Grand Forks, for Joseph F. Larson, Myron Brieland and Norman Erickson.

Jerald L. Engelman, of Vinje & Engelman, Mayville, and Damon E. Anderson, Grand Forks, for First State Bank of Buxton, Buxton; First and Farmers Bank, Portland; and Bank of N.D., Bismarck; argued by Damon E. Anderson, Grand Forks.

Daniel S. Kuntz, Asst. Atty. Gen., Public Service Com'n, Bismarck, for Public Service Com'n.

ERICKSTAD, Chief Justice.

These are consolidated appeals from a judgment and amended judgment entered by the District Court of Traill County in connection with insolvency proceedings commenced by the North Dakota Public Service Commission [PSC] against Valley Farmers Bean Association [VFBA]. The district court found VFBA to be an insolvent grain warehouseman under the provisions of Chapter 60–04, N.D.C.C.,[1] and appointed the PSC to serve as trustee of a trust fund created for the benefit of outstanding receipt holders. The district court directed the PSC as trustee to pay approximately 114 claims of persons who delivered dry edible beans to VFBA but did not receive redelivery or payment for the beans. The appeals in this case relate to the district court's granting of summary judgment against the surety and approval of the trustee's report on the marshaling of trust fund assets.

The surety, Millers National Insurance Company [Millers], and appellants Joseph F. Larson, Myron Brieland, and Norman Erickson, former members of the board of directors of VFBA [Directors],[2] challenge the district court's determination that Millers is liable for $171,337, which represents the deficiency between VFBA's inventory on the date of insolvency and the amount

---

1. Because the transactions which gave rise to the claims in these proceedings took place before July 1, 1983, this case is governed by the warehouseman statutes in effect prior to July 1, 1983. Therefore, unless otherwise indicated, all statutory citations are to the provisions in existence prior to July 1, 1983.

2. Larson, Brieland and Erickson are defendants in a third party action brought by Millers. In its third party action, Millers alleges that Larson, Brieland and Erickson are contractually obligated to indemnify it for any liability incurred as a consequence of the issuance of the bonds. The district court severed the third party action from the other actions and granted a Rule 54(b), N.D.R.Civ.P., certification.

The Directors also filed an objection to the trustee's report and recommendations which was denied by the district court as part of the insolvency proceedings.

represented by outstanding receipts. Appellants First State Bank of Buxton; First and Farmers Bank, Portland; and Bank of North Dakota [Banks] challenge the district court's denial of their claim for $2,172,345, which represents the unpaid principal and interest due on a loan made by the Banks to VFBA. We affirm the judgment and amended judgment of the district court.

## BACKGROUND

From August 1, 1981, to July 31, 1982, VFBA was a licensed public warehouseman which specialized in the storage and sale of dry edible beans and operated elevators at Portland, Buxton and Gilby. Millers is the surety under three North Dakota warehouseman's bonds naming VFBA as principal and containing a combined penal sum of $450,000.

During the spring of 1981, VFBA executed a number of "Dry Edible Pinto Bean Grower Agreement[s]" [grower agreements] with producers. Under the grower agreements, each producer contracted to grow a designated quantity of pinto beans during the 1981 season for delivery to VFBA at the time of harvest. VFBA agreed to pay a specified price per hundred weight for the beans in three installments following delivery. The grower agreements contained delivery dates of October 30, 1981; October 31, 1981; or November 1, 1981.

VFBA accepted delivery of beans from farmers in excess of their contract amounts and also accepted delivery of beans from farmers who had not entered into grower agreements. Some contracted beans were delivered to VFBA after the grower agreement delivery dates; however, VFBA was unable to accept delivery of beans from some growers because its elevators were full.

Upon receipt of the beans, VFBA issued scale tickets showing the quantity and grade of the beans and the warehouse location, but the scale tickets were not subsequently converted to storage tickets or cash tickets. Most of the people who entered into grower agreements were paid for the beans in accordance with the agreement.

During January 1982, VFBA executed a promissory note and a discretionary line of credit agreement with the First State Bank of Buxton for the sum of $3,400,000. The First State Bank of Buxton was the lead member in a loan participation arrangement involving the First and Farmers Bank, Portland and the Bank of North Dakota. As security for the loan, VFBA executed two security agreements giving the Banks a security interest in all of VFBA's personal property, including inventory, accounts, and contract rights. Financing statements were filed with the Traill County Register of Deeds and the Secretary of State.

As VFBA periodically drew against its line of credit, "warehouse receipts" were prepared and delivered to the Banks. Each receipt stated that a quantity of beans had been "[r]eceived in store of First State Bank of Buxton." Written notations on the receipts stated that they were "non-negotiable" and were either "collateral" or "security" for a "seasonal line of credit of $3.4 million."

In early 1982, VFBA attempted to compile a list of all deliveries made by producers during the fall of 1981 which were not made pursuant to grower agreements. On May 5, 1982, VFBA sent those producers a letter which stated in relevant part:

"Our records reflect that you currently have on storage at our facilities the quantity of pinto beans as set forth at the end of this letter.

"The Board of Directors has authorized the management to give you three choices with respect to these pinto beans:

"The Association offers to purchase your pinto beans by paying $10 per hundred weight, less one-half of the applicable storage as set by North Dakota law, with payment to be made as soon as feasible, but in no event later than June 30, 1982, *and* an unsecured promissory note, bearing no interest,

due and payable in 20 years, less the other one-half of the applicable storage as set by North Dakota law, so that the net amount of your payment and promissory note would be as indicated below. Grade of beans other than No. 1 reduces the price accordingly.

"Alternately, you may elect to continue your pinto beans on storage, at rates as currently established by North Dakota, with further directions and instructions concerning the marketing of said commodity to be given by you in the future as you desire.

"You may elect to have your pinto beans returned to you. In that case they will be cleaned and bagged for which the Association will charge $3.15 per hundred weight less storage as currently established by North Dakota law, with return delivery dates to be set in the order they are received. Said delivery would be approximately during the month of July 1982.

"We must have your election of one of the three choices set forth above in our possession by no later than *Monday, May 17, 1982*. If we do not hear from you by then we will assume that you wish to continue to have us hold your beans on storage pursuant to your further instructions as you might direct in the future." [Emphasis in original.]

Most of the producers who received the letter, which has commonly become known as the "10/10" contract or letter, chose the first option proposal. While most of the producers signed and returned the 10/10 letter in accordance with its terms, some producers did not sign or return the letter, some signed and returned it without selecting an option, and others did not sign or return it until after May 17, 1982. None of the producers received a cash payment, a promissory note or redelivery of their beans in accordance with the terms of the 10/10 letter.

In August 1982, the PSC filed an application for appointment as trustee of a trust fund for the benefit of outstanding receipt holders of VFBA. Following a hearing, the district court determined that VFBA was an insolvent grain warehouseman as defined in Chapter 60–04, N.D.C.C., and granted the PSC's application. On November 16, 1982, VFBA filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code. On January 24, 1983, the bankruptcy court lifted the automatic stay and authorized the PSC to continue to act as trustee under state law.

The PSC published notice to holders of unredeemed receipts, and claims from the Banks and from 114 persons were filed. The PSC liquidated VFBA's inventory for which it received $271,400. On October 25, 1983, the PSC filed with the district court its report recommending that all of the claims be paid from the trust fund, with the exception of the Banks' claim. The PSC recommended that disbursements from the trust fund be made first from the proceeds of the sale of VFBA inventory and then from funds received from Millers, the surety on the three warehouseman's bonds.

The PSC filed a complaint against Millers seeking deposit of the penal sums of the bonds into the trust fund, and Millers filed a third party complaint against the Directors of VFBA seeking indemnification. The district court consolidated the PSC's action against Millers with the insolvency proceeding and severed Millers' third party action against the Directors.

The district court directed Millers to prepare a motion for summary judgment on the legal issues and directed the PSC and the Banks to categorize claims "based upon the type of transaction leading to the claim." Following a hearing, the district court dismissed the Banks' claim, ordered Millers to pay the balance necessary to satisfy the other claims, and directed the PSC to file a final report on the proposed distribution of the trust fund. An amended judgment was entered on July 9, 1984, from which Millers, the Banks and the Directors of VFBA have appealed.

### BANKS' APPEAL

The Banks assert on appeal that the district court erred in not requiring the PSC to represent their interests in the insolvency proceedings; in determining that the Banks did not have a valid claim against the warehouseman's bonds or the trust fund; and in granting summary judgment dismissing their claim.

### I. Trust Administration

#### A. *Duties of trustee*

The Banks assert that the PSC, as trustee, was required to represent their interest as a "receipt holder" because the PSC has the statutory duty to represent all receipt holders in an insolvency proceeding. Neither the general principles of the law of trusts nor our statutory scheme require that the PSC, as trustee, blindly advocate the asserted interests of a claimant to the trust fund without regard to its belief as to the validity of the claim.

■ Although a trustee is under a duty to deal impartially with the beneficiaries of a trust [see *Wehe v. Wehe*, 63 N.D. 176, 247 N.W. 54 (1932); Restatement (Second) of Trusts § 183 (1959) ], the trustee is also under a duty to protect and preserve the trust assets and to defend actions which may result in loss to the trust, unless under all of the circumstances it is reasonable not to make such defense. *See Brisnehan v. The Central Bank and Trust Company*, 134 Colo. 47, 299 P.2d 113 (1956); *In re Lunt's Trust*, 236 Iowa 28, 17 N.W.2d 803 (1945); *State ex rel. Strykowski v. Wilkie*, 81 Wis.2d 491, 261 N.W.2d 434 (1978); Restatement (Second) of Trusts § 178 (1959); 2 A. Scott, The Law of Trusts § 178 (3d ed. 1967); G. Bogert, The Law of Trusts and Trustees § 581 (2d ed. rev. 1980).

■ We conclude that if the PSC, acting in the capacity of trustee under the provisions of Chapter 60–04, N.D.C.C., has a good faith reasonable belief that a claimant is not a valid receipt holder and that the claim is therefore adverse to the trust, it is under no duty to advocate the asserted interests of that claimant. Rather, the failure of the PSC to protect the integrity of the trust would constitute a violation of its fiduciary duty to valid receipt holders. *Brisnehan, supra;* G. Bogert, *supra.* The PSC did not violate its trust responsibilities in this case.

#### B. *Procedural challenges*

■ The Banks contend that the PSC's opposition to their claim has denied them a remedy at law for the losses it has sustained. They rely on § 60–04–05, N.D.C.C., which provides in pertinent part that "[n]o receipt holder shall have a separate cause of action upon the warehouseman's bond, nor for insurance, nor against any person converting said stored grain, nor against any other receipt holder, except through such trustee, ..." This assertion is without merit.

The Banks filed their claim with the PSC pursuant to the provisions of § 60–04–04, N.D.C.C. The PSC, in its report to the district court, recommended that the Banks' claim be denied. The district court provided the Banks and the other claimants the opportunity to object to the trustee's report. The Banks objected, and following two hearings on the matter, the district court concluded that the Banks had no valid interest in the trust fund. Thus, the Banks were provided a forum and an opportunity to present and defend their claim.

■ The Banks also challenge the procedure used in this case. The Banks appear to argue that the PSC should have marshaled the trust fund including the entire penal sum of the warehouseman's bonds before a determination was made as to who was entitled to the trust fund proceeds. Instead, the district court consolidated the insolvency proceeding with the PSC's action against Millers.

Chapter 60–04, N.D.C.C., does not clearly set forth a specific procedure to be used in administering the trust. However, the Banks' responsibility to prove its claim was the same in the consolidated procedure as it would have been if the PSC had filed its report after full recovery of the bond.

Thus, the procedure used in this case did not violate any of the Banks' rights.

## II. Validity of Banks' Claim

The Banks contend that the district court erred in determining that they did not have a valid claim against the trust fund or the warehouseman's bonds.

VFBA received a line of credit from the Banks. The Banks took a security interest in VFBA's inventory, accounts, and contract rights. As the loan funds were disbursed, VFBA prepared and delivered "warehouse receipts" to the Banks. During September 1982, VFBA sold its Portland warehouse to the Portland Farmers Elevator Company and its Buxton warehouse to the Central Valley Bean Co-op. Because beans were stored in each of these structures at the time of sale, three additional "warehouse receipts" were issued by the other warehousemen to VFBA. Each receipt contains an endorsement from VFBA to the Banks.

The Banks contend that the "warehouse receipts" received from VFBA, the three "warehouse receipts" issued by other warehousemen to VFBA and endorsed to the Banks, and the security agreement with VFBA, all constitute valid claims against the trust fund and the warehouseman's bonds.

### A. *Trust fund liability for receipts issued by VFBA*

■ Upon the insolvency of a grain warehouseman, a trust fund is created "for the redemption of outstanding storage receipts of such warehouseman ...." § 60–04–02, N.D.C.C. A warehouse receipt may only be issued "upon the actual delivery of grain to the warehouse for storage." § 60–02–16(1), N.D.C.C. In *State ex rel. Public Service Commission v. R.F. Gunkelman & Sons, Inc.*, 219 N.W.2d 853 (N.D. 1974), this court held that where a party purchases grain from a warehouseman without taking delivery and receives warehouse receipts as evidence of the sale, the warehouse receipts are valid claims against an insolvent warehouseman, even though the receipt holder did not actually deliver grain to the warehouse in return for the receipts. However, that case does not alter the fundamental principle that the party to whom the warehouse receipt is issued must have an ownership interest in the grain described on the warehouse receipt. An ownership interest is not synonymous with a security interest. *See* § 41–01–11(37)(1–201), N.D.C.C.

■ Section 41–09–02(1)(a)(9–102), N.D.C.C., provides that a secured transaction is "[a]ny transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts." The test for determining if a particular transaction falls within the purview of Chapter 41–09, N.D.C.C., is whether or not the transaction is "intended to have effect as security." *Production Credit Ass'n of Minot v. Melland,* 278 N.W.2d 780, 786 (N.D.1979). If that intent can be gleaned from the four corners of the instruments in question, the determination is a question of law for the court to decide. *Wallwork Lease & Rental v. JNJ Investments,* 303 N.W.2d 545 (N.D.1981); *State Bank, Etc. v. All-American Sub, Inc.,* 289 N.W.2d 772 (N.D.1980). The titles or labels attached to the documents by the parties are not conclusive. *All-American Sub, Inc., supra.*

■ The "warehouse receipts" issued to the Banks specifically state that they were issued as "collateral" or "security" for the $3,400,000 line of credit. The Banks' pleadings in connection with the insolvency proceedings state that the "warehouse receipts ... were given as collateral for a loan." The Banks have not asserted in this proceeding that they delivered grain to the warehouse in exchange for the receipts, that they paid for the beans reflected on the receipts, or that they paid fees for the storage of the beans. It is clear from the undisputed evidence that the "warehouse receipts" submitted by the Banks in support of their claim were only intended to serve as security for the loan to VFBA. Thus, the Banks' "warehouse receipts"

were invalid because they did not have an ownership interest in the beans.

### B. *Trust fund liability for receipts issued by other warehousemen*

With regard to the three "warehouse receipts" issued by other warehousemen to VFBA which were endorsed to the Banks, we agree in essence with the district court's analysis and resolution of the issue:

"Portland Farmers Elevator Company and Central Valley Bean Co-op had no statutory authority or legal basis to issue such warehouse receipts. The warehouse receipts are 'paper transactions' at most which created on paper a property interest that did not exist. The issuance of the warehouse receipts was not done in conformity to statutes. The beans presumably stored were already burdened by scale tickets to the claimants hereinbefore described. VFBA had no authority to endorse over warehouse receipts except as to beans over and beyond its own storage liability. In a circuitous and bootstrap transaction, VFBA could not by endorsement of storage tickets issued by other warehouses defeat the ownership interest of producers having beans stored in VFBA itself. Having no title to such beans by Portland and Central, the warehouse receipts are a nullity. Having no title in such beans by VFBA, the warehouse receipts are a nullity. The warehouse receipts all being a nullity, the endorsement becomes a nullity. A transferee can acquire no greater title than its transferor had. 41–02–48 NDCC."

■ The trial court correctly concluded that the "warehouse receipts" issued by VFBA to the Banks and the "warehouse receipts" issued to VFBA and endorsed by it to the Banks were a nullity. Those receipts did not change the Banks' status from that of a secured creditor to that of a "receipt holder." Consequently, the Banks were not entitled to share in trust fund assets.

### C. *Surety liability for Banks' claim*

The Banks assert that they have a claim against the warehouseman's bonds because VFBA did not faithfully perform its duties as a public warehouseman. *See* § 60–02–09(4)(a), N.D.C.C. The Banks allege that Millers is liable as surety because VFBA issued warehouse receipts to them without adequate inventory to cover the receipts and because VFBA converted the inventory in violation of the security agreement. In support of their argument, the Banks rely on *In re Caldwell Port Elevator Co., Inc.*, 28 B.R. 669 (Bkrtcy.W.D.La.1982); *Avoca State Bank v. Merchants Mut. Bonding Co.*, 251 N.W.2d 533 (Iowa 1977); and *St. Paul Ins. v. Fireman's Fund American Ins.*, 309 Minn. 505, 245 N.W.2d 209 (1976).

These cases are distinguishable. The court in *St. Paul Insurance, supra,* 245 N.W.2d at 212, 216, did not address the question of whether or not a surety is liable for storage receipts pledged in a loan transaction in return for cash advances. *In re Caldwell, supra,* 28 B.R. at 670, and *Avoca State Bank, supra,* 251 N.W.2d at 536, involved situations in which a warehouseman issued warehouse receipts to himself for grain the warehouseman did not have and then pledged the receipts as security for a loan. The issue in those cases of whether a warehouse receipt issued in the name of the warehouseman and held as collateral by a bank constitutes a valid claim against a warehouseman's bond is not an issue in the present case.

■ We have concluded that the warehouse receipts were improperly issued in the name of the Banks, who had neither purchased beans from nor delivered beans to VFBA, and who merely intended the receipts to confirm their security interest in VFBA inventory. A warehouseman's bond is not intended to protect holders of warehouse receipts which are invalid on their face. *See Central Nat. Bank of Mattoon v. Fidelity & Deposit Co. of Maryland,* 324 F.2d 830 (7th Cir.1963); *Central States Corp. v. Trinity Universal Ins. Co.,* 237 F.2d 875 (10th Cir.1956), *cert. denied,* 352

U.S. 1003, 77 S.Ct. 561, 1 L.Ed.2d 548 (1957).

The Banks also claim that they are entitled to recover from the warehouseman's bonds because VFBA converted its inventory in violation of the security agreement. We disagree.

■■■■■ Section 60–02–09(3), N.D.C.C., provides that a warehouseman's bond "shall ... [r]un to the state of North Dakota for the benefit of all persons *storing or selling* grain in such warehouse." [Emphasis added.] Under the plain terms of the statute, it is clear that warehouseman's bonds are not intended to protect all persons who conduct financial transactions with a warehouseman. This court has previously determined that warehouseman's bonds are "not for the benefit of the general creditors of the warehouseman." *Larkin v. Wheat Growers Warehouse Co.*, 64 N.D. 491, 494, 253 N.W. 757, 759 (1934). *Cf. Dairy Dept. v. Harvey Cheese, Inc.*, 278 N.W.2d 137 (N.D.1979). We likewise conclude that the bonds are not intended for the benefit of secured creditors of the warehouseman. To extend bond coverage to a secured creditor such as the Banks in this case would effectively reduce the protection available to producers for whose benefit and protection the statute was designed.

We hold that the Banks do not have a valid claim against the warehouseman's bonds in the instant case.

D. *Priorities concerning inventory*

The Banks assert that, as a secured creditor, they are entitled to the $271,400 in proceeds obtained through the PSC's sale of VFBA's inventory.

■■■■ The Banks have no claim to that portion of VFBA's inventory which represents beans held for storage. When a public warehouseman accepts grain for storage, "such delivery shall be a bailment and not a sale of the grain so delivered," and "[i]n no case shall the grain so stored be liable to seizure upon process of any court in any action against such bailee, except in an action by an owner of such warehouse receipt to enforce the terms thereof." § 60–02–25, N.D.C.C.

A much closer question arises with regard to the competing interests of the Banks and the unpaid sellers of beans in the remaining inventory of VFBA.

■■■■ Upon the insolvency of a grain warehouseman, a trust fund consisting of "[a]ll the grain in said warehouse" is established for the redemption of outstanding receipts. § 60–04–02(1), N.D.C.C. In *State ex rel. Public Service Commission v. R.F. Gunkelman & Sons, Inc.*, 219 N.W.2d 853, 859 (N.D.1974), this court held that because the purpose of the trust fund is to insure that farmers storing or selling grain in an insolvent warehouse receive payment for that grain to the fullest extent possible, assets of the insolvent warehouseman should be considered "grain" includable in the trust fund "whenever reasonable."

In *In re Gotham Provision Co., Inc.*, 669 F.2d 1000 (5th Cir.), *cert. denied sub nom. First State Bank of Miami v. Gotham Provision Company, Inc.*, 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982), the Fifth Circuit Court of Appeals was faced with an analogous issued which arose under the trust provisions of the Packers and Stockyards Act of 1921, 7 U.S.C. § 181 *et seq.*[3] In that case, a bank entered into a financing arrangement with Gotham whereby the bank would advance funds and take as collateral a security interest in Gotham's inventories, accounts receivable, and proceeds from the sale of meat. Gotham filed for bankruptcy, leaving a substantial loan balance due to the bank. Sev-

---

**3.** 7 U.S.C. § 196, provides in pertinent part:
 "§ 196. *Statutory trust established*
 \* \* \* \* \* \*
 "(b) All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers: ..."

eral livestock producers who had made cash sales to Gotham had not been paid. An escrow fund was created for the collection of Gotham's accounts receivable.

The livestock producers claimed that their interest in the escrow fund was superior to that of the bank. The court agreed, stating:

> "[W]e believe that if a lender could defeat the § 206 [7 U.S.C. § 196] trust merely by taking a security interest in inventories and receivables, the clear intention of Congress would be thwarted and the trust provision of the Act would be reduced to a nullity. We hold that so long as cash sellers remain unpaid for their livestock sold to a packer subject to § 206, that packer must hold his inventories, accounts receivable and proceeds derived from cash sales for the benefit of the cash sellers until such time as they are fully paid. Where the packer has given a lender a security interest in inventories and receivables that are subject to the § 206 trust, the unpaid cash sellers have priority over those assets and may recover the proceeds of those receivables to the extent of the outstanding balance on the cash sales." *In re Gotham Provision Co., Inc., supra,* 669 F.2d at 1009–1010. [Footnote omitted.]

■■■■ Likewise, we do not believe the Legislature intended that the trust provisions of § 60–04–02, N.D.C.C., could be defeated by a lender taking a security interest in an insolvent grain warehouseman's inventory. The purpose of Chapter 60–04, N.D.C.C., is to aid receipt holders in redeeming their receipts for as close to their full value as possible. Construing this legislation "with a view to effecting its objects and to promoting justice" [§ 1–02–01, N.D.C.C.], we conclude that the valid receipt holders had priority over the Banks to VFBA's inventory.

### E. *Banks' claim to black turtle beans*

The Banks contend that because VFBA's inventory included almost 8,500 hundred weight of black turtle beans, and because all of the producer claims filed with the PSC were for pinto beans, the Banks have a valid claim to the black turtle bean inventory. We disagree.

■■■ Section 60–04–02(1), N.D.C.C., states that the trust fund shall consist of "[a]ll the grain in said warehouse." In *R.F. Gunkelman & Sons, Inc., supra,* grain had been processed by the warehouseman prior to the insolvency. This court ruled that in order to effectuate the purpose of Chapter 60–04, N.D.C.C., those assets were properly considered "grain" and includable in the trust fund for the benefit of receipt holders. The same rationale applies in the present case.

■■■ We conclude that the trust fund consists of not only the type and quality of grain represented by claims filed by producers, but all of the grain remaining in the warehouse at the time of insolvency. Therefore, the black turtle beans were properly included in the trust fund assets.

### III. Summary Judgment

The Banks assert that the district court erred in granting summary judgment in this case because there remain outstanding factual issues regarding the validity of their claim.

■■■ Assuming for purposes of argument that the rules regarding review of summary judgments are applicable with regard to the denial of the Banks' claim,[4] we conclude that the district court did not err. The Banks have not asserted, through affidavit or otherwise, that they actually sold beans to or stored beans with VFBA. We have stated that when no pertinent evidence resisting a motion for summary judgment is presented to the lower court, a presumption arises that no such evidence

---

**4.** The district court's ruling involved two separate but consolidated proceedings. The district court granted summary judgment against Millers as to its liability under the various categories of claimants. The district court, as part of the insolvency proceedings, approved the trustee's recommendation that the Banks' claim be denied.

exists. *Gowin v. Hazen Memorial Hosp. Ass'n.*, 349 N.W.2d 4 (N.D.1984) *First Nat. Bank of Hettinger v. Clark,* 332 N.W.2d 264 (N.D.1983). The Banks' "warehouse receipts" in this case were invalid on their face, and the Banks have failed to indicate what additional information they could introduce to establish their claim. Under these circumstances, the district court is not required to conduct additional proceedings to determine the validity of the Banks' claim.

The district court did not err in denying the Banks' claim in its entirety.

### MILLERS' APPEAL [5]

Millers raises numerous issues on appeal. The thrust of Millers' argument is that the district court erred in ruling that producer claims governed by grower agreements or 10/10 contracts came within the scope of Millers' bond liability under the provisions of § 60–02–09(7), N.D.C.C. Millers asserts that these agreements were deferred payment contracts or other credit arrangements which were outside the scope of Millers' bond liability. Millers also asserts that no producer claim should be paid until it is determined that the claim was based on a delivery to one or more of VFBA's bonded warehouses; no claim should be paid until its factual validity has been judicially determined in an evidentiary hearing; interest on eligible claims should not be paid prior to October 29, 1982, the date the district court signed its order finding VFBA to be insolvent; and that the trial court erred in directing that the PSC is entitled to reimbursement for its "out-of-pocket" expenses from trust fund assets.

### I. The Grower Agreements and 10/10 Contracts

In its memorandum opinion and order approving the trustee's report, the district court categorized the trust fund claimants as follows and ruled that Millers was liable for the deficiency in the trust fund necessary to pay them:

"A) Those producers having a written contract entitled as a 'Grower Agreement' delivered beans to VFBA and received a scale ticket but received no storage ticket.

"B) Those producers who delivered beans; received a scale ticket; received a 10/10 letter from VFBA; and which producer did not sign or return the letter indicating the options available to the producer.

"C) Those producers who delivered beans; received a scale ticket; received a 10/10 letter from VFBA; returned the 10/10 letter but failed to select any option.

"D) Those producers who delivered beans; received a scale ticket; received a 10/10 letter from VFBA; signed the option proposals in the letter but after the May 17, 1982 deadline.

"E) Those producers who delivered beans; received a scale ticket; received a 10/10 letter from VFBA and which producer returned the 10/10 letter timely and selected the first option in writing.

"None of the producers in the above four categories B), C), D) and E) received any cash payment or any promissory note. None of the producers had their beans returned to them. None of the producers received any warehouse receipts at any time.

"F) Producers who delivered beans to VFBA who were not under a "Grower Agreement" as given in category A) above, nor did such producer receive a 10/10 letter as given in category B), C), D) or E) above. These producers received scale tickets from VFBA but received no storage ticket.

"G) Producers who have delivered beans; received a scale ticket from VFBA and NDPSC has no evidence that such producers had an unpaid sales agreement with VFBA or that such producers received a 10/10 letter. These producers are considered as having stored their beans with VFBA."

---

**5.** Most of the issues raised by Millers are also raised by the Directors. For simplification, we will refer to the collective assertions of Millers and the Directors as those of Millers.

The majority of claims came from producers who had entered into grower agreements, labeled category "A" claimants by the district court, and from producers who had entered into the 10/10 contracts, labeled category "E" claimants by the district court.

Millers contends that, as a matter of law, the grower agreements and 10/10 contracts constituted valid deferred payment contracts or other credit arrangements under § 60–02–09(7), N.D.C.C., and that all deliveries governed by such agreements were therefore outside the scope of the warehouseman's bonds. The district court ruled that both the grower agreements and 10/10 contracts had been "canceled", or "terminated" because VFBA did not fulfill its obligations under the contracts, and consequently that no written contracts governed. The court concluded that all of the beans were therefore delivered for storage, rendering all deliveries eligible for redemption from the trust fund and warehouseman's bonds. Millers asserts that those determinations by the district court were in error.

### A. Validity of grower agreements

The district court ruled that VFBA breached the grower agreements by failing to accept delivery of the beans covered by the agreements in a timely fashion. The district court concluded that such conduct by VFBA, coupled with the fact that the agreements could be modified only in writing, affected a "cancellation" of the grower agreements, and that any subsequent deliveries made by the growers became deliveries for storage. We disagree.

In 11 S. Williston, A Treatise on the Law of Contracts § 1305 (3d ed. 1968), it is stated that:

"Neither where the plaintiff's excuse for his own non-performance is the defendant's actual breach of the contract nor where that excuse is a prospective breach because of repudiation does the plaintiff terminate the contract merely by availing himself of his excuse. The contract still exists, but one party to it has a defense and an excuse for non-performance." [Footnote omitted.]

Thus, assuming that VFBA's failure to accept timely delivery of the beans constituted a material breach of the grower agreements, that breach did not of itself "cancel" or "terminate" the grower agreements. Rather, the producers who had entered into the grower agreements were thereby released from their obligations under the agreements and had the *right* to pursue the remedies as provided in § 41–02–82(2–703), N.D.C.C. *See Ziebarth v. Kalenze*, 238 N.W.2d 261 (N.D.1976); *Mott Equity Elevator v. Svihovec*, 236 N.W.2d 900 (N.D.1975). The grower agreements, themselves, remained in existence.

### B. Validity of 10/10 contracts

The district court ruled that VFBA, as a bailee in possession of the goods, never accepted delivery of the beans covered by the contracts because it failed to receive from the producers appropriate documents of title under § 41–02–51(4)(a)(2–503), N.D.C.C.:

"*41–02–51. (2–503) Manner of seller's tender of delivery.*

"4. Where goods are in the possession of a bailee and are to be delivered without being moved:

"a. Tender requires that the seller either tender a negotiable document of title covering such goods or procure acknowledgment by the bailee of the buyer's right to possession of the goods; ..."

We believe that subsection 4(a) of the statute involves a situation in which a bailee merely holds possession of the goods and the sales transaction occurs between a seller and buyer unrelated to the bailee. Where, as in the present case, the buyer is also the bailee who has physical possession of the goods when the contract is executed, delivery of a negotiable document of title as a form of tender is unnecessary, absent an express agreement to the contrary.

Ordinarily, a proper tender is made if the seller puts and holds conforming

goods at the buyer's disposition and gives the buyer any notification reasonably necessary to enable him to take delivery. *See* § 41–02–51(1)(2–503), N.D.C.C.; *Sand Seed Service, Inc. v. Bainbridge,* 246 N.W.2d 911 (Iowa 1976); 3 R. Anderson, Uniform Commercial Code § 2–503:4 (3d ed. 1983).

 In this case, VFBA had physical possession of the beans at the time the 10/10 contracts were executed. The beans covered by the 10/10 contracts were therefore at VFBA's "disposition" at the time the contracts were executed. The mechanics of tender were not set forth in the parties' agreement. Under the provisions of § 41–02–51(2–503), N.D.C.C., no further tender of a negotiable document of title was necessary to accomplish a proper tender of delivery.

Alternatively, the district court ruled that the 10/10 contracts were executory in nature because VFBA never tendered payment for the beans. Section 41–02–59(1)(2–511), N.D.C.C., provides that "[u]nless otherwise agreed tender of payment is a condition to the seller's duty to tender and complete any delivery." The district court concluded that "VFBA never tendered the cash or the promissory note and the failure to do so results in no delivery of the goods and results in an executory agreement."

 An "executory contract" has been defined as "[a] contract the obligation (performance) of which relates to the future." Black's Law Dictionary 512 (5th ed. 1979). However, "a contract is not executory merely because it has not been fully performed by payment, if all the acts necessary to give rise to the obligation to pay have been performed." *Wagstaff v. Peters,* 203 Kan. 108, 453 P.2d 120, 124 (1969).

 In this case, the beans had already been delivered to VFBA by the producers. This gave rise to VFBA's obligation to pay the producers under the terms of the 10/10 contracts. VFBA's failure to make the agreed payments may have resulted in a material breach of the 10/10 contracts giving rise to a cause of action on the part of the producers, but it did not automatically extinguish the contracts or convert them into "executory" agreements. The 10/10 contracts were valid, executed agreements.

## C. *Novation*

Millers asserts that a novation occurred between VFBA and the producers who validly entered into the 10/10 agreements and, therefore, that the 10/10 contracts now determine the rights of those producers, regardless of any pre-existing agreements between the parties. Having concluded that no new agreements arose by virtue of the 10/10 contracts, the district court did not specifically address the issue.

 Novation is defined as "the substitution of a new obligation for an existing one." § 9–13–08, N.D.C.C. A novation is created by the substitution of a new obligation between the same parties with the intent to extinguish the old obligation. § 9–13–10(1), N.D.C.C.; *see First National Bank, Bismarck v. O'Callaghan,* 143 N.W.2d 104 (N.D.1966). A novation is created by contract and is subject to all the rules governing contracts in general. § 9–13–09, N.D.C.C.; *Weiss v. Anderson,* 341 N.W.2d 367, 372 n. 2 (N.D.1983). Thus, for a novation to be valid, in addition to the requirement that the parties intend to extinguish the old obligation, there must also exist mutual assent and sufficient consideration. § 9–01–02, N.D.C.C.

We believe that each of the requisite elements for a valid novation exist in this case. In addition to mutual assent and consideration, each option proposal provided:

"By signing, dating and returning the additional copy of this letter with your intentions as referred to herein, you are to understand that you do hereby release and forever discharge the Valley Farmers Bean Association, its officers, directors, employees and agents from any further liability with respect to the pinto beans described herein and shall make no further claim or demand, and shall neither bring or pursue any action, suit or other proceeding of any nature against the releasees herein stated for damages

**544**

arising out of the transaction described herein, and in particular for any damage or loss caused by or arising out of the Association's handling and/or processing of your pinto beans."

■ The above-quoted language expresses an intent to substitute the new rights and obligations contained in the 10/10 agreement for the terms and conditions of any pre-existing agreements. Therefore, the 10/10 contracts now determine the rights of all producers who validly entered into those agreements.

D. *Deferred payment contracts or other credit arrangements*

Section 60–02–09(7), N.D.C.C., provides:

*"60–02–09. Bond filed by track buyer or public warehouseman.* Before any license is issued to any public warehouseman or track buyer under this chapter, the applicant for such license shall file a bond with the commission which shall:

\* \* \* \* \* \*

"7. Not accrue to the benefit of any person entering into deferred payments contracts or other credit arrangements with a track buyer or public warehouseman."

Having concluded that neither the grower agreements nor the 10/10 contracts were automatically "canceled" or "terminated," we must next determine whether or not the agreements constituted "deferred payments contracts or other credit arrangements" under § 60–02–09(7), N.D.C.C.

The phrase "deferred payments contracts or other credit arrangements" contained in § 60–02–09(7), N.D.C.C., at the time of the insolvency, was not statutorily defined. Millers asserts that the phrase should be construed to include any transaction in which the sales price is to be paid after delivery of the grain, regardless of the length of the delay, be it hours or days. *See Parnell v. Baham,* 228 So.2d 53 (La.Ct. App.1969); 77 C.J.S. *Sales* § 235 (1952). Neither the legislative history of the 1971 amendment excluding such transactions (*see* Minutes of the House Committee on

Agriculture, January 28, 1971 [H.B. 1241] ), nor the purpose of the warehouseman statutes support Millers' position.

The rules of statutory construction require that we construe statutes liberally, with a view to effecting their objects and to promoting justice. § 1–02–01, N.D.C.C. The overriding purpose of requiring warehouseman's bonds is to protect all persons who sell or deliver grain to a warehouseman. *Larkin v. Wheat Growers Warehouse Co.,* 64 N.D. 491, 253 N.W. 757 (1934). In *State v. Hoover Grain Co.,* 63 N.D. 344, 248 N.W. 275, 278 (1933), this court stated:

"It is clearly the intent of the Legislature, however, that this law shall be comprehensive enough to settle the legitimate demands of owners of grain delivered to an insolvent elevator company, against those who have liability because of such grain—an insurance company in case grain is destroyed, a surety on a bond in case grain is not paid for, and those liable for the conversion of the grain. The law was intended for the benefit of the claimants, and must be construed with sufficient liberality to effectuate its purpose without doing injury to those who are liable."

If Millers' argument that *any* delay in payment following delivery constitutes a deferred payment contract or other credit arrangement were carried to its logical extreme, no producers selling grain in a warehouse would be entitled to protection under a warehouseman's bond because there is always some delay between delivery and payment. We do not believe the Legislature intended a result which is so wholly inconsistent with the statutory scheme.

■ We conclude that whether or not a transaction constitutes a deferred payment contract or other credit arrangement depends not only on a delay in payment following delivery, but also on the expectations and intentions of the parties to the agreement. *Cf. In re Samuels & Co., Inc.,* 510 F.2d 139 (5th Cir.1975), *reversed en banc on other grounds,* 526 F.2d 1238 (5th Cir.), *cert. denied sub nom., Stowers v.*

*Mahon,* 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976). We believe that this interpretation most reasonably harmonizes the amendment with the purpose of the warehouseman statutes.

The payment provision in the grower agreements provides:

"5. Settlements and payments shall be made on the contracted portion of beans only. Settlements and payment shall be made in 3 payments: One-third, (1st Payment), 30 days after completion of contract; One-third, (2nd Payment), on November 15th, 1981; One-third, (3rd Payment), on December 30th, 1981, *unless deferred payment is requested by Grower.*" [Emphasis added.]

█ Although the contract provision specifies that three payments shall be made following delivery, the inclusion of the phrase "unless deferred payment is requested by Grower" clearly indicates that neither VFBA, the drafter of the agreement, nor the producers considered the grower agreements to be deferred payment contracts.

Although § 60–02–09(7), N.D.C.C., also excludes "other credit arrangements" from bond coverage, we do not believe the grower agreements fall within the statutory provision. In Syllabus 1 of *Savelkoul v. Board of County Com'rs, Ward County,* 96 N.W.2d 394 (N.D.1959), this court stated: "Under the principle of ejusdem generis, general words following particular and specific words are not given their natural and ordinary sense, standing alone, but are confined to persons and things of the same kind or genus as those enumerated." Thus, we do not consider the phrase "or other credit arrangements" to necessarily expand the meaning of "deferred payments contracts."

We conclude that the grower agreements are not "deferred payments contracts or other credit arrangements" *within the meaning of § 60–02–09(7), N.D.C.C.*

With regard to the producers who entered into the 10/10 contracts, we note that although they originally received scale tickets upon delivery of the beans, VFBA did not convert the scale tickets into cash or storage tickets. Section 60–02–11, N.D. C.C., provides that "[a]ll scale tickets shall be converted into cash or storage tickets within a period of twenty days after first load of grain is delivered to the elevator and no longer than five days after final load is delivered to the elevator." Pursuant to § 60–02–09(3) and (6), N.D.C.C., a warehouseman's bond shall "[r]un to the state of North Dakota for the benefit of all persons storing or selling grain in such warehouse," and shall "[b]e, at all times, in a sufficient sum to protect the holders of outstanding storage receipts and cash tickets or checks." Although VFBA failed to convert the scale tickets as required by law, that failure does not result in loss to the producers, but constitutes a violation of § 60–02–09(4), N.D.C.C., for which Millers is liable. *See Farmers Elevator Mutual Insurance Company v. Jewett,* 394 F.2d 896 (10th Cir.1968); *cf. State v. Hoover Grain Co.,* 63 N.D. 344, 248 N.W. 275 (1933). These producers were clearly covered by the warehouseman's bonds prior to May 1982.

About three months before VFBA became insolvent, the 10/10 letters were sent to producers. One of the options allowed the producers to have their beans returned to them for a price, and another allowed them to keep their beans on storage. The only sales option provided that a $10 per hundred weight payment would be made "as soon as feasible, but in no event later than June 30, 1982, and an unsecured promissory note, bearing no interest, due and payable in 20 years ..." would presumably be given at $10 per hundred weight as the other half of the sales price.

█ The producers who entered into the 10/10 contracts did so in a good faith attempt to settle on payment terms which were advantageous to VFBA. It would be unconscionable to construe that good faith act on the part of the producers as resulting in a voluntary change of their status as receipt holders covered under the warehouseman's bonds to persons having en-

tered into "deferred payments contracts or other credit arrangements" and no longer covered under the warehouseman's bonds. In addition, we believe that to apply § 60–02–09(7), N.D.C.C., in such a manner to the 10/10 contracts would be contrary to public policy and the fundamental purpose of the warehouseman statutes which are intended to protect all persons storing and selling grain in the warehouse. Consequently, we conclude that the producers who entered into 10/10 contracts do not fall within the category of persons who entered into "deferred payments contracts or other credit arrangements" under § 60–02–09(7), N.D. C.C.

Even if we were to assume for discussion purposes only that the 10/10 contracts were deferred payment contracts, there is yet another reason for affirming the trial court.

The statutory provision exempting deferred payments contracts or other credit arrangements from warehouseman's bond coverage was enacted in 1971. *See* 1971 N.D.Sess.Laws Ch. 583. The legislative hearing testimony indicates a concern that many of the elevators in the state would be unable to afford the larger bonds required to cover the liability under such contracts. One committee member stated that the provision would clarify bond coverage so that "the farmer will know where he stands," and that by entering into such agreements, a farmer "will be sticking his own neck out." *See* Minutes of the House Committee on Agriculture, January 28, 1971 [H.B. 1241]. One of the sponsors of the bill noted that the main purpose of the bill was "to protect the farmer when he has his product in the elevators." *See* Minutes, *supra.*

The rules of statutory construction require that we construe statutes liberally, with a view to effecting their objects and to promoting justice. § 1–02–01, N.D.C.C. The overriding purpose of requiring warehouseman's bonds is to protect all persons who sell or deliver grain to a warehouseman [*see Larkin v. Wheat Growers Warehouse Co.,* 64 N.D. 491, 253 N.W. 757

(1934)], and a surety's liability on a bond is conditioned on the faithful performance of a public warehouseman's duties under the law. § 60–02–09(4), N.D.C.C. *See State v. Hoover Grain Co., supra.*

In light of the obvious purpose of the warehouseman statutes, and in order to give the 1971 amendment a meaning consistent with the overall statutory scheme, we believe that under § 60–02–09(7), N.D. C.C., a public warehouseman has a duty to disclose to producers entering into "deferred payments contracts or other credit arrangements" the risks of doing so. Without such a requirement, the warehouseman statutes would be reduced to a trap for unwary producers, a result we do not believe was contemplated by the Legislature in amending the statute, and which is wholly inconsistent with the statutory scheme.

In the present case, the 10/10 contracts do not inform the producers that by the acceptance of its provisions, the producers would be surrendering their rights of coverage under the warehouseman's bonds. We conclude that by its failure to so inform the producers in the terms of the agreement, VFBA breached its duties under § 60–02–09(4), N.D.C.C. Because the warehouseman statutes were designed to protect the producers, the violation of subsection (4) takes precedence over the subsection (7) exemption provision of the statute, and Millers is liable as surety to those producers who entered into the 10/10 contracts without written notice that they would be giving up their rights to bond coverage.

The decision we have reached today is in harmony with the latest amendments to Chapter 60–02, N.D.C.C. *See* 1983 N.D. Sess.Laws Ch. 672, § 13. Section 60–02–19.1, N.D.C.C., currently provides that in order to be effective, a credit sale contract must be in writing and "shall state in a clear and prominent manner that the sale is not protected by the bond coverage provided for in section 60–02–09; ..." We have held that "[t]he principles of statutory construction do not prevent a court from look-

ing to subsequent enactments and amendments as an aid in arriving at the correct meaning of a prior statute." *State v. Novak*, 338 N.W.2d 637, 640 (N.D.1983). *See also Slawson v. North Dakota Indus. Com'n*, 339 N.W.2d 772, 775 n. 2 (N.D. 1983).

▇▇ Thus, we hold that the claims filed by producers who entered into grower agreements and of those who entered into 10/10 contracts are valid against the trust fund and the warehouseman's bonds.

## II. Deliveries to Other Warehouses

Millers asserts that the claims filed by persons who delivered their beans to a location other than VFBA's warehouses are not valid claims against the trust fund.

As noted earlier herein, VFBA operated three elevators located at Buxton, Gilby and Portland. Each warehouse was covered by a separate bond. VFBA also accepted deliveries in Reynolds and Fessenden. Producers making deliveries to these latter locations received scale tickets having a printed warehouse designation of Portland or a joint designation of Portland and Buxton.

Millers relies on authorities stating that policies of insurance specifying the location of the insured property extend no coverage to the insured's operations at other locations. *See* 1 G. Couch, Couch on Insurance 2d § 5:15 (rev. 2d ed. 1984); *Pruser v. State Farm Fire & Cas. Co.*, 286 Pa.Super. 126, 428 A.2d 604 (1981). However, a warehouseman's bond, unlike an insurance policy, secures the obligations of the warehouseman and is conditioned on the warehouseman's faithful performance of his duties and compliance with the provisions of law and the rules and regulations relating to the storage and purchase of grain. § 60-02-09(4), N.D.C.C.

▇▇ The PSC has construed Chapter 60-02, N.D.C.C., to allow a warehouseman to accept grain at points other than the physical location of the warehouse, and upon acceptance the grain is protected by the bond coverage for the warehouse for which a scale ticket is issued. That construction is entitled to some weight where the agency interpretation does not contradict clear and unambiguous statutory language. *E.g., Application of Skjonsby Truck Line, Inc.*, 357 N.W.2d 227 (N.D. 1984). We believe the PSC's interpretation is reasonable and consistent with the statutory scheme, and we conclude that a surety is responsible for the obligations of the warehouseman incurred through the operation of its warehouse regardless of where the physical acceptance and control of the grain took place. Therefore, persons who delivered beans to locations other than VFBA's bonded warehouses, but who received scale tickets with a warehouse designation of Portland or Buxton, have valid claims against the trust fund and the warehouseman's bonds.

## III. Evidentiary Hearing

Millers asserts that no claim should be paid until its factual validity has been judicially determined through a separate evidentiary hearing.

▇▇ The PSC filed its trustee's report on October 25, 1983, recommending payment of producer claims, and a copy of the report was served on Millers. The PSC filed its final report, and at the hearing on May 31, 1984, although it raised no objection to any specific claim, Millers asserted that the PSC was required to prove the sufficiency and basis for the 114 claims at an evidentiary hearing. The court denied Millers' motion, stating that if Millers had an objection to a certain claim, it had the responsibility to present a specific objection rather than a general objection. We agree.

▇▇ The insolvency procedure established under Chapter 60-04, N.D.C.C., is designed to provide a prompt method for receipt holders to recover their claims. The PSC is given the authority to collect the claims [§ 60-04-04, N.D.C.C.], prosecute or compromise the claims [§ 60-04-07, N.D.C.C.], and file a report with the court showing the amount payable on each receipt [§ 60-04-09, N.D.C.C.]. If the PSC

were required to establish through an evidentiary hearing the factual basis for each claim to the satisfaction of the surety, the objective of Chapter 60–04, N.D.C.C., would be thwarted.

Millers was afforded ample time to review the claims and VFBA's records. If Millers had an objection to one or more of the claims, it had the responsibility to specify the basis for the objection so that the PSC could have introduced evidence in response to the objection. We believe that the procedure used in this case was proper and met the purpose of the insolvency statutes while fulfilling the requirements of procedural due process.

We also note that the only evidence of ownership by some of the producers in this case consisted of scale tickets rather than warehouse receipts or storage tickets. Although § 60–02–11, N.D.C.C., requires that a public warehouseman convert all scale tickets into cash or storage tickets, VFBA converted none of the scale tickets as required by the statute.

With regard to those producers, VFBA's failure to convert the scale tickets as required by law constituted a violation of § 60–02–09(4), N.D.C.C., for which Millers is liable. "To permit the surety to take advantage of the failure of the warehouseman to do what the law compels him to do would permit a surety to profit by its principal's wrong." *Farmers Elevator Mutual Insurance Company v. Jewett*, 394 F.2d 896, 900 (10th Cir.1968). The scale tickets were properly considered as evidence of proof of the producers' claims. *See State v. Hoover Grain Co.*, 63 N.D. 344, 248 N.W. 275 (1933).

### IV. Interest

Millers asserts that interest on the claims should not be paid for any period of time prior to October 29, 1982, the date the district court signed its order finding VFBA to be insolvent and appointing the PSC trustee. The judgment and amended judgment direct that interest should be paid on producer claims from August 17, 1982, the date the PSC filed its petition for appointment as trustee.

Section 60–04–09, N.D.C.C., provides that the amount payable to each claimant shall be determined "according to the market prices as of the day of the insolvency, with legal interest thereon." Section 60–04–02, N.D.C.C., provides that a warehouseman shall be deemed to be insolvent whenever the warehouseman refuses or neglects, upon proper demand, to redeem any receipt issued by him. Construing those provisions together, we conclude that interest begins to run from the date the warehouseman fails to redeem a receipt, rather than from the·date the district court signs the order finding the warehouseman insolvent and appointing the PSC trustee.

Although it is unclear when VFBA first failed to redeem a receipt, it was not later than the date the PSC filed an application for appointment as trustee along with supporting documents indicating VFBA's insolvent status. The district court did not err in directing that interest on the claims shall run from August 17, 1982.

### V. Trustee's Expenses

Millers asserts that the district court erred in directing that the PSC is entitled to reimbursement for the $2,024 in expenses it incurred as trustee. Millers does not contend that the amount is unreasonable but that there is no statutory authority for such an award. We disagree with Millers' contention.

This court implicity recognized the authority for such reimbursement in grain warehouseman insolvency proceedings in *State v. Wheat Growers' Warehouse Co.*, 63 N.D. 640, 249 N.W. 718 (1933). In 1983 § 60–04–10, N.D.C.C., was amended to specifically mention the PSC's right to reimbursement for expenses incurred in acting as trustee. *See* 1983 N.D.Sess.Laws Ch. 674, § 12. The district court's allowance of expenses also accords with the general statutes regarding the administration of trusts which specifically provide for the reimbursement of the trustee's expenses.

*See* §§ 59–02–15 and 59–04–21, N.D.C.C. We hold that the district court correctly ruled that the PSC was entitled to reimbursement for its expenses in administering the trust fund.

In accordance with this opinion, the judgment and amended judgment granting summary judgment and approving the trustee's report are affirmed in all respects.

ERICKSTAD, C.J., GIERKE, J., and PEDERSON and ILVEDSON, Surrogate Justices, concur.

Surrogate Justice PEDERSON participated in this case by assignment pursuant to § 27–17–03, N.D.C.C.

ILVEDSON, S.J., sitting in place of VANDE WALLE, J., disqualified.

Justice PAUL M. SAND, who died on December 8, 1984, was a member of this Court at the time this case was submitted.