**NORTH DAKOTA PUBLIC SERVICE COMMISSION, Petitioner and Appellee,**

v.

**JAMESTOWN FARMERS ELEVATOR, INC., Respondent,**

**Farmland Mutual Insurance Company, Respondent and Appellant.**

Civ. No. 870214.

Supreme Court of North Dakota.

April 18, 1988.

**406**

Lynn Lee Schloesser (argued), Public Service Com'n, State Capitol, Bismarck, for petitioner and appellee.

Lamb, McNair, Larson & Carlson, Ltd., Fargo, for respondent and appellant; argued by Bruce H. Carlson.

MESCHKE, Justice.

Farmland Mutual Insurance Company (Farmland), the surety on a warehouseman's bond for Jamestown Farmers Elevator, Inc. (JFE), appealed from a judgment making $41,634.12 payable to the North Dakota Public Service Commission (PSC) for disbursement to the Commodity Credit Corporation (CCC). We reverse.

JFE, a public grain warehouse licensed by the PSC, filed for liquidation as a bankrupt under Chapter 7 of the Bankruptcy Code on January 21, 1983. A trustee of the bankruptcy estate was appointed on February 22, 1983.

At bankruptcy, JFE held a substantial quantity of grain in storage, for which it had issued warehouse receipts. CCC held the warehouse receipts, which were pledged as collateral by farmers for their loans from CCC. The bankruptcy trustee attempted to sell the stored grain in August 1983, but did not do so until after March 29, 1984, when the bankruptcy court resolved a dispute as to ownership of the stored grain and warehouse receipts in favor of CCC.[1] When the grain was sold, CCC assigned its warehouse receipts to the purchaser of the grain.

At bankruptcy, the stored grain was in good condition. After that date, no one took any significant steps to preserve the grain and it deteriorated in quality due to heat, moisture, and insect damage. When the grain was sold in April 1984, its worth had decreased from deterioration in quality. The bankruptcy trustee eventually paid CCC $472,084.41, as the net proceeds from sale of the stored grain.

Thereafter, CCC wrote the PSC, asserting a claim for $192,583.23 against JFE's bond. CCC calculated its claimed loss by subtracting the $472,084.41 paid to it by the bankruptcy trustee from $664,667.64, which CCC attributed as the value of the grain. The PSC asked the bankruptcy court to modify the automatic stay, which the bankruptcy court did on November 13, 1985. Then, the PSC applied to the state district court for appointment as trustee under Ch. 60–04, N.D.C.C.[2] The trial court appointed the PSC as statutory trustee.

The trial court held that the grain "must be valued at the market price on the date of insolvency," January 21, 1983. Curiously, the trial court ruled that "CCC's claim

---

**1.** JFE's possessory interest in the stored grain authorized the bankruptcy court to resolve competing claims to the grain and warehouse receipts. *State of Missouri v. U.S. Bankruptcy Court,* 647 F.2d 768 (8th Cir.1981).

11 U.S.C. § 363(f) authorized sale of the grain despite competing ownership claims. *See In re Cox Cotton Co.,* 24 B.R. 930 (E.D.Ark.1982), *reversed on other grounds, Lindsey v. Ipock,* 732 F.2d 619, 622 (8th Cir.1984) ("bankruptcy court did not err in ordering the sale of the grain").

11 U.S.C. § 557 now provides for more expeditious bankruptcy procedures to resolve ownership, proof of claims, requests for relief from the automatic stay of proceedings under 11 U.S.C. § 362(a), requests for abandonment, sale, and distribution of grain or the proceeds of grain when the bankrupt owned or operated a grain storage facility. Such matters will ordinarily be determined within 120 days, although 11 U.S.C. § 557(f) provides:

"*(f)* The court may extend the period for final disposition of grain or the proceeds of grain under this section beyond 120 days if the court finds that—

*(1)* the interests of justice so required in light of the complexity of the case; and

*(2)* the interests of those claimants entitled to distribution of grain or the proceeds of grain will not be materially injured by such additional delay."

**2.** All references to Chapters 60–02 and 60–04, N.D.C.C., are to provisions in effect on the date of JFE's insolvency. We do not consider amendments adopted in 1983 and 1985.

under State insolvency law" and the "accrued liability of the surety [Farmland]" were both "suspended by exercise of exclusive jurisdiction of the bankruptcy court," but went on to hold Farmland liable for the loss from deterioration of the quality of the grain during the bankruptcy.

The trial court calculated the loss as $41,-634.12, by determining that the market value of the grain on January 21, 1983 was $573,632.17, and deducting the entire proceeds from sale of the grain, $531,998.05, rather than the net distribution to CCC of $472,084.41. In effect, this disallowed as part of the loss $59,913.64 paid for administrative expenses of the trustee in bankruptcy. The trial court ordered Farmland to pay PSC the $41,634.12 deficit, plus interest, and ordered the PSC to disburse those funds, less expenses of $2,691.21, to CCC. Farmland appealed from the judgment.

Contending that it "insured the acts of the warehouseman which, after the filing of the bankruptcy petition, had neither the legal authority nor capacity to care for the grain," Farmland argued that: (1) CCC had no claim against the bond because it had assigned the warehouse receipts to the buyer of the grain; (2) CCC breached a duty to care for the grain and to mitigate its damages; and (3) the bankruptcy trustee was CCC's agent in caring for the grain. The PSC responded that: (1) CCC's claim was valid; (2) the bankruptcy trustee, but not CCC, had a duty to care for the grain; and (3) the bankruptcy trustee was obligated to fulfill the duties of a bonded warehouseman for which Farmland was liable.

The PSC also argued that the trial court erred in failing to allow the bankruptcy trustee's expenses as part of the claim. The PSC, however, "did not cross-appeal and may not seek a more favorable result on appeal than it received in the trial court." *Board of County Comm'rs, McLean County v. Peterson Excavating, Inc.*, 406 N.W.2d 674, 677 (N.D.1987).

We assess Farmland's central thesis that it only "insured the acts of the warehouseman which, after the filing of the bankruptcy petition, had neither the legal authority nor capacity to care for the grain."

Section 60–02–09, N.D.C.C., required that a public warehouseman file a bond to:

"3. Run to the state of North Dakota for the benefit of all persons storing or selling grain in such warehouse;

"4. Be conditioned:

"a. For the faithful performance of his duties as public warehouseman or track buyer;

"b. For compliance with the provisions of law and the rules and regulations of the commission relating to the storage and purchase of grain by such warehouseman or track buyer; ..."

The warehouseman's duty was set by § 60–02–22, N.D.C.C.: "A public warehouseman shall be liable to the owner for the delivery of the kind, grade, and quantity of grain called for by the warehouse receipt."

Chapter 60–04, N.D.C.C., established an insolvency procedure "designed to provide a prompt method for receipt holders to recover their claims." *North Dakota Pub. Serv. Comm'n v. Valley Farmers Bean Ass'n, supra*, 365 N.W.2d 528, 547 (N.D. 1985). Section 60–04–02, N.D.C.C., said:

"*Insolvency of warehouseman—Trust fund established.*—Whenever any warehouseman, ..., shall refuse or neglect, ..., to redeem any receipt issued by him, such warehouseman shall be deemed to be insolvent within the meaning of this chapter, and a trust fund for the redemption of outstanding storage receipts of such warehouseman shall consist of the following:

"1. All the grain in said warehouse;

\*    \*    \*    \*    \*    \*

"3. The cause of action for damages upon any bond given by said warehouseman to the state of North Dakota to insure faithful performance of his duties as a warehouseman; ..."

These statutes framed JFE's obligation and Farmland's liability as its surety. "A surety's liability on a statutory bond could not be extended to cover duties of the warehouseman other than those defined in the statutes...." 9A *Appleman, Insurance Law and Practice* § 5752, pp. 538–

539 (1981). *See also Republic Underwriters v. Tillamook Bay Fish Co.*, 127 S.W.2d 219 (Tex.Civ.App.1937). Thus, Farmland's liability as surety on JFE's bond should not extend beyond that created by pertinent statutes.

From the filing of the bankruptcy petition, the grain was in the exclusive custody of the bankruptcy court ("custodia legis"). *Acme Harvester Co. v. Beekman Lumber Co.*, 222 U.S. 300, 32 S.Ct. 96, 56 L.Ed. 208 (1911); *Red Carpet Corp. v. Miller*, 708 F.2d 1576 (11th Cir.1983). 11 U.S.C. § 521(3) required JFE to "surrender to the trustee all property of the estate," which, under 11 U.S.C. § 541(a)(1), is comprised of "all legal or equitable interests of the debtor."

██ Both the bankruptcy trustee and CCC knew that the quality of the grain was deteriorating. The trustee took no significant steps to protect grain quality and CCC did not request him to do so. The trustee of a bankrupt grain warehouseman has an "obligation to protect the interests of farmers and others who have ownership rights in the grain" (*State of Missouri v. U.S. Bankruptcy Court, supra*, 647 F.2d at 771) and may be liable for negligence (*Red Carpet Corp. v. Miller, supra*). 11 U.S.C. § 322 provided that, to qualify as a bankruptcy trustee, a person must file "a bond in favor of the United States conditioned on the faithful performance of such official duties."

CCC also did not seek relief from the automatic stay under 11 U.S.C. § 362 or request the trustee to abandon his interest in the grain under 11 U.S.C. § 554. *See* § 60–04–05, N.D.C.C., ("Nothing contained in this chapter shall be construed to prohibit or prevent any receipt holder, ..., from pursuing concurrently such other remedy as he may have against the person or property of such warehouseman, ..."). While "the PSC, as trustee of the trust fund created under Chapter 60–04, N.D.C.C., has 'a duty to protect and preserve the trust assets,'" [*North Dakota Pub. Serv. Comm'n v. Central States Grain, Inc.*, 371 N.W.2d 767, 774 n. 4 (N.D.1985), *quoting North Dakota Pub. Serv. Comm'n v.*

*Valley Farmers Bean Ass'n, supra*, 365 N.W.2d at 536], the PSC was not called upon to act, in this case, until after the grain had been sold.

The grain was in good condition when JFE filed its bankruptcy petition. The deterioration of the grain took place during the summer of 1983 while it was in the custody of the bankruptcy trustee. Under §§ 60–02–09 and 60–04–02, N.D.C.C., Farmland was required to insure only JFE's faithful performance of its duties as a public warehouseman. The statutes did not require that Farmland's bond insure the faithful performance of the bankruptcy trustee's duties. Farmland is, therefore, not liable for any loss suffered by CCC as a result of deterioration in the quality of the grain while it was in the custody and control of the bankruptcy trustee.

██ Of course, liability on a warehouseman's bond may extend beyond the immediate point of insolvency for that period reasonably necessary to initiate procedures and to secure the goods. Thus, for example, it has been held that a bond continued during the winding-up phase of a business while "affairs were in a state of flux" after "takeover" of most its business by a purchaser. *Kelly Associates, Ltd. v. Aetna Cas. & Sur. Co.*, 681 S.W.2d 593, 596 (Tex. 1984). In this case, however, the deterioration in the quality of the grain occurred well after JFE no longer had responsibility for the grain.

We conclude that Farmland cannot be required to pay the claim asserted on the warehouseman's bond by the PSC on behalf of CCC. The judgment is reversed.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ., concur.